ORBANCO, INC., an Oregon corporation, Plaintiff,
and
Jack Courtemanche, Intervenor Plaintiff,

v.

SECURITY BANK OF OREGON, an Oregon State Bank, et al., Defendants and Third Party Plaintiffs.

Civ. No. 73–836.

United States District Court,
D. Oregon.

Feb. 1, 1974.

Barnes H. Ellis, Kenneth D. Stephens, Frederick H. Torp, of Davies, Biggs, Strayer, Stoel & Boley, Portland, Or., for ORBANCO, Inc.

Norman J. Wiener, Harvey C. Barragar, of Miller, Anderson, Nash, Yerke & Wiener, Portland, Or., for Courtemanche.

John J. Higgins, of Black, Kendall, Tremain, Boothe & Higgins, Portland, Or., for Security Bank of Oregon.

John L. Schwabe, Roland F. Banks, Jr., Donald Joe Willis, of Souther, Spaulding, Kinsey, Williamson & Schwabe, Portland, Or., for defendants Brice.

SKOPIL, District Judge:

## I.

## NATURE OF THE ACTION

This action arises out of tender offers extended by plaintiffs, ORBANCO, Inc. and Jack Courtemanche. They want to acquire control of the defendant Security Bank of Oregon. Plaintiffs allege violations by defendants of the Williams Act and FDIC rules and regulations. Defendants have counterclaimed. They contend that plaintiffs' tender offers are invalid because of alleged violations of the Bank Holding Act, antitrust laws, and federal securities law.

## II.

## JURISDICTION

The Court has jurisdiction pursuant to 28 U.S.C. § 1331(a) and Sections 12(i), 13(e), 14(e), and 27 of the Securities Exchange Act of 1934, 15 U.S.C. §§ 78*l*(i), 78m(e), 78n(e), and 78aa, and rules and regulations promulgated thereunder by the Federal Deposit Insurance Corporation, including 12 C.F.R. § 335.-4(g)(4) and § 335.5(m).

## III.

## FACTS

Plaintiff ORBANCO, Inc. is a corporation with its principal place of business in the state of Oregon. ORBANCO is a bank holding company. It is the sole shareholder of The Oregon Bank, an Oregon state bank, and Northwest Acceptance Corporation, an Oregon corporation. ORBANCO and its subsidiaries are engaged in the business of providing financial services, primarily banking and capital goods financing.

Plaintiff Jack Courtemanche is the son of Louis Courtemanche, Jr., the Chairman of the Board of Directors of ORBANCO. He and his children own 206,779 shares (10.3% of the stock) of ORBANCO. He is a Director of Northwest Acceptance Corporation.

Defendant Security Bank of Oregon is an Oregon state bank with its principal place of business in the state of Oregon. The deposits of Security Bank are insured with the Federal Deposit Insurance Corporation. It is not a member of the Federal Reserve System. It has issued and outstanding 224,100 shares of capital stock.

Defendant George Brice, Jr. is President and Chairman of the Board of Directors of Security Bank. He owns or controls not less than 62,078 shares of its capital stock.

Defendant George Brice, III is a Vice President and Director of Security Bank. He owns or controls not less than 1,185 shares of its capital stock.

During the early part of 1973, ORBANCO attempted to acquire Security Bank by unsuccessful negotiation with George Brice, Jr. It decided to acquire controlling interest of the bank by a tender offer.

Security Bank stock was issued at $10 par value. During the third quarter of

1973, the bid quotations on the over-the-counter market as reported by the National Quotations Bureau, Inc. were 9½. Between October 9 and October 15, 1973, the interdealer bid quotations in the over-the-counter market ranged from $9¼ to $9¾ per share.

Not knowing the length of time required to obtain Federal Reserve Board approval, 12 U.S.C. § 1841 et seq., OR-BANCO entered into an agreement with Jack Courtemanche. If Federal Reserve Board approval was not obtained prior to the expiration of the first tender offer, ORBANCO would assign all of its rights to Jack Courtemanche. Courtemanche would be bound by the conditions and terms of the tender offer. If regulatory approval was obtained, Courtemanche would sell to ORBANCO all shares purchased by him through the tender offer for an amount equal to his costs and expenses, less any dividends received. If approval is not obtained by November 6, 1974, Courtemanche is to be relieved of any further obligation to ORBANCO and will hold the shares for his own investment.

On October 17, 1973, ORBANCO and Courtemanche filed a Form F–11 with FDIC pursuant to 12 C.F.R. § 335.-4(g)(2) and § 335.5(1). Later that day they made a tender offer to the stockholders of Security Bank to purchase 120,000 shares at $17 per share. The offer was to expire at 5:00 p. m. on November 9, 1973, unless extended. In the tender offer, they fully disclosed the terms of their agreement and the requirements of the Bank Holding Company Act necessitating the agreement.

On October 17, 1973, defendant George Brice, Jr. received the tender offer. He immediately wrote a letter to the stockholders of Security Bank. It encouraged them to reject the tender offer. He stated that the offer of $17 per share was inadequate, representing that he had rejected previous offers of $34 per share. The representation was false. Prior to the mailing of the letter, George Brice, Jr. was required to file with FDIC. 12 C.F.R. § 335.5(m).

Brice failed to file the required Form F–12.

Between October 17, 1973, the date the defendants received the tender offer, and November 9, 1973, the date the tender offer expired, George Brice, Jr. purchased 5,718 shares and George Brice, III purchased 1,000 shares of Security Bank stock. The Brices failed to file with FDIC the statement required by 12 C.F.R. § 335.4(g)(4)(i). Also, they failed to send to the shareholders a statement containing the information to be filed with FDIC. This is required under 12 C.F.R. § 335.4(g)(4)(ii).

On October 31, 1973, I issued a Temporary Restraining Order prohibiting the Brices from purchasing equity securities of Security Bank without prior approval of the Court and compliance with 12 C.F.R. § 335.4.

On November 29, 1973, I vacated the portion of the Order requiring prior Court approval before purchase.

On October 19, 1973, a meeting of Security Bank's Board of Directors was held. The Board granted Robert E. Moore, Executive Vice President of the bank, an option to purchase 12,750 shares at $15.50 per share. The minutes of that meeting disclose the Board's interest in defeating the tender offer.

On October 30, 1973, ORBANCO filed for Federal Reserve Board approval. At the expiration of the tender offer, approval had not been granted. Accordingly, Courtemanche acquired the stock. To date, approval has not been granted.

Forty-eight percent of the Security Bank stock was tendered in the first offer. It was taken in the name of Jack Courtemanche. On November 28, 1973, prior to the second tender offer, OR-BANCO and Courtemanche filed Form F–11 with FDIC.

On the same day, the second tender offer was made. It offered to purchase at $17 per share all shares validly tendered. The second offer was to expire on December 7, 1973, unless extended. In the second tender offer, ORBANCO reiterated its agreement with Courte-

manche and its position under the Bank Holding Company Act. Without prior Federal Reserve Board approval, OR-BANCO could not acquire more than five percent of the bank's stock. 12 U.S.C. § 1842(a)(3). In this offer OR-BANCO stated it would acquire no more than five percent of the bank's stock until it received approval from the Federal Reserve Board. Approximately 7,000 shares were tendered. This amount was less than five percent. ORBANCO took the shares in its own name.

## IV.

### FEDERAL SECURITIES LAWS

Defendants contend that plaintiffs have violated the Securities Exchange Act of 1934, 15 U.S.C. §§ 78d and 78e, and the rules and regulations prescribed by FDIC pursuant to 15 U.S.C. § 78l(i).

I find that ORBANCO and Courtemanche filed with FDIC the necessary statements prior to the tender offers. They contained all of the information required by 15 U.S.C. § 78n(d)(1) and § 78m(d)(1), and 12 C.F.R. § 335.-5(1) and § 335.4(i). The filings did not omit any material facts, nor were the facts stated misleading. The second filing was signed by Courtemanche prior to its completion. This does not make it invalid. The form was completed under the direction and control of his attorney and with his authorization.

I also find that the tender offers neither contained any untrue statements of material facts nor omitted to state material facts necessary in order to make the statements not misleading under the circumstances. The plaintiffs did not violate 15 U.S.C. § 78n(e), 12 C.F.R. § 335.5(h), or § 335.4(i).

## V.

### SHARES PURCHASED BY THE BRICES

The Williams Act and its implementing regulations strictly regulate purchases by a target company or its management. It guarantees full disclosure to the public. It affords the shareholders a fair and orderly opportunity to consider a tender offer. Prior to making a purchase, the target company or its management must file with FDIC. The filing must include the names of the persons purchasing, the purpose of the purchase, volume, price, and the source of financing. Additionally, they must have sent to the shareholders within the past six months the substance of the information contained in the filing. 12 C.F.R. § 335.4(g)(4).

The purchases by George Brice, Jr. of 5,718 shares and by George Brice, III of 1,000 shares were made in violation of these provisions. Some were purchased in violation of the Temporary Restraining Order. The November 6, 1973, amended § 335.4(g)(4) statement filed with FDIC and the November 8, 1973, communication to the shareholders do not legitimatize these purchases. The Brices violated the provisions of 12 C.F.R. § 335.4(g)(4). They should be denied the fruits of illegally obtained purchases. Chris-Craft Industries, Inc. v. Bangor Punta Corp., 480 F.2d 341 (2nd Cir. 1973).

The Brices are ordered to tender to Jack Courtemanche the shares purchased by them between October 17, 1973, and November 9, 1973. They are also ordered to tender any additional stock, of which the Court may not have been informed, purchased by them during this period. The stock is to be tendered at $17 per share. The Brices are to be reimbursed the amount they paid for the stock. The balance is to be paid to the shareholders from whom the stock was purchased.

## VI.

### OPTION SHARES GRANTED TO ROBERT E. MOORE

Section 14(e) of the Securities Exchange Act of 1934, 15 U.S.C. § 78n(e), prohibits the use of manipulative acts or practices in connection with a tender offer. The option given to

Robert E. Moore to purchase Security Bank stock was a manipulative act. The Board is ordered to cancel the option to purchase.

## VII.

### BANK HOLDING COMPANY ACT

Defendants contend that ORBANCO set up an illicit scheme to circumvent the provisions of the law. They claim the agreement with Courtemanche was contrived to keep the tender offer a secret until October 17, 1973.

As a bank holding company, ORBANCO is required to obtain Federal Reserve Board approval before it can acquire, directly or indirectly, more than five percent of the voting shares of a bank. 12 U.S.C. § 1842(a).

The tender offers of October 19, 1973, and November 28, 1973, fully disclosed the relationship and the agreement between Courtemanche and ORBANCO. Courtemanche's promise to sell the stock to ORBANCO if Board approval is received prior to November 6, 1974, was disclosed in the tender offers and in the filings with FDIC and the Federal Reserve Board.

The history and purposes of the Bank Holding Company Act are set forth in the U.S.Code Congressional and Administrative News (1970) p. 5520 et seq., as follows:

"In 1956, Congress enacted the Bank Holding Company Act to provide for the regulation of the activities and acquisitions of companies controlling 25 percent or more of the stock of two or more banks. In reporting on that legislation in 1955, the committee stated that it was ' * * * not the committee's contention that bank holding companies are evil of themselves. However, because of the importance of the banking system to the national economy, adequate safeguards should be provided against undue concentration of control of banking activities. The dangers accompanying monopoly in this field are particularly undesir-

able in view of the significant part played by banking in our present national economy.'

"That report indicated that there were two primary problems involved with bank holding companies. One was the unrestricted ability of such a company to obtain banking units, thereby concentrating the commercial bank facilities in a particular area under a single control. The other was the combination, again under a single control of banking and nonbanking enterprises. This latter situation constituted a departure from the established policy of separating banking from other commercial enterprises." ·

The filing requirements under the Williams Act and FDIC rules and regulations are primarily for disclosure purposes. The Bank Holding Company Act goes beyond mere disclosure. The Board's paramount interest is preventing centralization of our national economy in a few banks.

The Bank Holding Company Act specifically provides in 12 U.S.C. § 1842(c) that:

"(c) The Board shall not approve—

"(1) any acquisition or merger or consolidation under this section which would result in a monopoly, or which would be in furtherance of any combination or conspiracy to monopolize or to attempt to monopolize the business of banking in any part of the United States, or

"(2) any other proposed acquisition or merger or consolidation under this section whose effect in any section of the country may be substantially to lessen competition, or to tend to create a monopoly, or which in any other manner would be in restraint or [sic] trade, *unless it finds that the anticompetitive effects of the proposed transactions are clearly outweighed in the public interest by the probable effect of the transaction in meeting the convenience and needs of the community to be served.*" (emphasis added)

The Supreme Court's decision in Whitney Nat. Bank v. Bank of New Orleans, 379 U.S. 411, 85 S.Ct. 551, 13 L.Ed.2d 386 (1965), is controlling. In *Whitney* the Court held:

> "We believe Congress intended the statutory proceedings before the Board to be the sole means by which questions as to the organization or operation of a new bank by a bank holding company may be tested. Admittedly the acquisition of an existing bank is exclusively within the jurisdiction of the Board.

> \* \* \* \* \* \*

> "This position is also supported by legislative history which shows that Congress rejected a proposal for a de novo review in the district courts of Board decisions on holding company proposals." 379 U.S. at 419–420, 85 S.Ct. at 557.

■ The Board is qualified to make the economic decisions demanded by the Bank Holding Company Act. They are required to consider the public interest, the anticompetitive effects of the proposed transactions, and the convenience and needs of the community to be served. Congress intended that the technical and complex problems involved in the application of the Bank Holding Company Act to the banking industry should be resolved, at least in the first instance, by a body of experts. They know the competitive realities of the banking business. This subject is outside the conventional experience of judges. See United States v. Manufacturers Hanover Trust Co., 240 F.Supp. 867, 880 (S.D.N.Y.1965).

Congress desired that the Federal Reserve Board have primary jurisdiction to consider possible violations of the Bank Holding Company Act and the antitrust consequences of the proposed acquisition by ORBANCO. The Board has not yet reached its decision on ORBANCO's application. It would be premature for me to hold that ORBANCO in any way violated the provisions of the Bank Holding Company Act or the antitrust laws.

The foregoing shall constitute findings of fact and conclusions of law pursuant to Fed.R.Civ.P. 52(2).

Plaintiffs shall submit a form of Judgment Order consistent with this Opinion.