**QUAKER CITY NATIONAL BANK, Plaintiff,**

v.

**Barbara C. HARTLEY, et al., Defendants.**

**No. C-2-81-1027.**

United States District Court, S. D. Ohio, E. D.

Dec. 22, 1981.

John W. Zeiger, Columbus, Ohio, for plaintiff.

Gerald L. Jones, Cambridge, Ohio, Paul W. Brown, Columbus, Ohio, for defendants.

## MEMORANDUM AND ORDER

DUNCAN, District Judge.

Plaintiff Quaker City National Bank (Quaker) has instituted this action pursuant to the Bank Holding Company Act of 1956 (the Holding Act), as amended, 12 U.S.C. §§ 1841 *et seq.*, and the Change in Bank Control Act of 1978 (the Control Act), as amended, 12 U.S.C. § 1817(j). Before the Court are defendants' motions to dismiss under Fed.R.Civ.P. 12(b)(1) and (6), and, in the alternative, for a protective order under Rule 26(c). Because the Court concludes that the former motion is well taken, however, it need not consider the latter.

I

Quaker is a national banking concern which belongs to the Federal Reserve System and the Federal Deposit Insurance Corporation, and as such is subject to the provisions of both the Control Act and the Holding Act. It has named as defendants in this lawsuit the American Bancorporation (American), Friends Cemetery Association (the Trust), Jeremy C. McCamic, and a small group of individual Quaker shareholders (the Group). American is a bank holding company and is within the purview of the Holding Act. McCamic is a director of American. The Trust is an association incorporated for purposes of holding and maintaining a cemetery, and it has been included in this action solely for purposes of fashioning the requested equitable relief.

Count One of the complaint charges that members of the Group pooled their respective holdings in Quaker and purchased additional Quaker stock without notifying the appropriate federal agency, thus violating 12 U.S.C. § 1817(j)(1). Count Two alleges in essence that defendant American was the motivating financial force behind the Group's actions, and that American thereby acquired a beneficial interest in approximately 51% of Quaker's voting stock without obtaining approval from the Federal Reserve Board, as is required by 12 U.S.C. § 1842(a). Counts Three and Four state that defendant McCamic, acting as American's agent, entered into an agreement with the Group whereby McCamic was given an option to purchase up to 51% of Quaker's stock, and that this change in beneficial interest was not reported either by McCamic or American. The gist of the complaint, then, is that American has acquired a controlling interest in Quaker without follow-

ing the rules set forth in either the Holding Act or the Control Act.

The defendants recognize that for purposes of their motion the Court must assume that plaintiff's allegations are true, but they argue that plaintiff's remedy is purely administrative. They contend, in other words, that no private cause of action can be implied from either statute under the guidelines laid down by the Supreme Court in *Cort v. Ash*, 422 U.S. 66, 95 S.Ct. 2080, 45 L.Ed.2d 26 (1975). The Court agrees.

## II

Under § 3 of the Holding Act, 12 U.S.C. § 1842(a)(3), no bank holding company may acquire direct or indirect ownership or control of more than 5% of the voting stock of any bank without the prior approval of the Federal Reserve Board (FRB). Upon receiving a request for approval the FRB must take into consideration whether the proposed acquisition would be in the best interests of the community to be served, including whether it would foster monopolization or other anticompetitive effects, and whether it would violate existing federal laws or regulations. 12 U.S.C. § 1842(c); *see also, Whitney National Bank v. Bank of New Orleans & Trust Co.*, 379 U.S. 411, 418, 85 S.Ct. 551, 556, 13 L.Ed.2d 386 (1965). Consistent with its task, the FRB is empowered to issue such orders and regulations as are necessary to enable it to carry out the purposes of the statute, and it may assess civil penalties of up to $1,000 per day on any company or individual who is found to have willfully violated any provision therein. 12 U.S.C. §§ 1844(c) and 1847(a). Nothing in the language of these provisions suggests that involvement of the courts was contemplated other than in an appellate capacity. *See* 12 U.S.C. § 1848.

It thus seems highly unlikely that Congress intended to provide private litigants a cause of action under the Holding Act. As the Supreme Court has observed:

> We believe Congress intended the statutory proceedings before the Board to be the sole means by which questions as to

organization or operation of a new bank by a bank holding company may be tested.

*Whitney National Bank, supra*, 379 U.S. at 419, 85 S.Ct. at 557. A few lines later, the Court added:

> Congress has set out in the Bank Holding Company Act of 1956 a carefully planned and comprehensive method for challenging Board determinations. That action by Congress was designed to permit an agency, expert in banking matters, to explore and pass on the ramifications of a proposed bank holding company arrangement. To permit a district court to make the initial determination of a plan's propriety would substantially decrease the effectiveness of the statutory design.

379 U.S. at 420, 85 S.Ct. at 557. In the wake of this language, the lower courts have summarily dismissed a variety of actions and theories of recovery under the Holding Act. *ORBANCO, Inc. v. Security Bank of Oregon*, 371 F.Supp. 125, 129 (D.Ore.1974); *First Alabama Bancshares, Inc. v. Lowder*, [1981 Transfer Binder] Fed. Sec.L.Rep. (CCH) ¶ 98,015 (N.D.Ala.1981). In fact, the Court is aware of no case in which a private cause of action has been entertained under the Holding Act.

Plaintiff contends that it is not trying to obtain court review of the merits of the proposed acquisition, but rather that it seeks only a declaration recognizing that defendants violated the Holding Act by not timely applying to the FRB for approval. Even if the Court were to recognize a narrow cause of action on this theory, though, it presumably could do no better than to order defendant American to make immediate application to the FRB, since the statute vests in the FRB sole authority to determine the proper civil remedy. 12 U.S.C. § 1847(b)(2). Here such an order would be useless, for it appears that American has already applied for FRB approval. Plaintiff Quaker has thus failed to state a cause of action under the Holding Act, and Counts Two and Four of the complaint must be dismissed.

## III

The Court believes that the same analysis must be applied to the remaining counts of the complaint, both of which are predicated on the Control Act. The provisions of that statute are remarkably similar to those of the Holding Act, save that the Control Act is aimed at any "person," including a bank holding company, that acquires direct or indirect control of 25% or more of a bank's voting stock. Section 1817(j)(1) provides, in part, that:

> No person, acting directly or indirectly through or in concert with one or more other persons, shall acquire control of any insured bank through a purchase, assignment, transfer, pledge, or other disposition of voting stock of such insured bank unless the appropriate Federal banking agency has been given sixty days prior written notice of such proposed acquisition and within that time period the agency has not issued a notice disapproving the proposed acquisition or extending for up to another thirty days the period during which such a disapproval may issue.

Like the Holding Act, the Control Act requires that the FRB review proposed acquisitions for potential adverse impact on market competition or the public interest in general, and it bestows upon the agency appropriate rule-making authority. 12 U.S.C. § 1817(j)(7) and (14). Willful violators of the Control Act are subject to a penalty of $10,000 a day, and such penalty is to be assessed directly by the FRB or other appropriate agency, though it appears that the FRB has little discretion to alter the $10,000 figure. 12 U.S.C. § 1817(j)(15).

Given these textual similarities, the Court sees no reason why the principles articulated by the Supreme Court in *Whitney National Bank, supra*, should not apply here. That decision, of course, was handed down well before passage of the bank control legislation, but drafters of the Control Act were undoubtedly aware of its impact upon Holding Act cases. Had they desired the district courts to assume original jurisdiction in Control Act disputes, they could have easily circumscribed the efforts of the Supreme Court's prior pronouncements. Instead, they chose to frame the statute in much the same terms as the Holding Act.

Yet even if *Whitney National Bank* does not control here, the Court finds that plaintiff has failed to meet the general prerequisites for implying a private statutory cause of action. In *Cort v. Ash*, 422 U.S. 66, 78, 95 S.Ct. 2080, 2088, 45 L.Ed.2d 26 (1975), the Supreme Court held that in determining whether a particular statute calls for private remedies, the reviewing court must consider (1) whether the proposed plaintiff is "one of the class for whose *especial* benefit the statute was enacted;" (2) whether the legislative history of the statute evidences Congressional intent either to create or deny such a remedy; (3) whether the proposed suit would be consistent with the underlying purposes of the legislative scheme; and (4) whether the cause of action is one traditionally relegated to state law. At least one court has examined these factors with respect to the Control Act and found that a private remedy does indeed exist. In *First Alabama Bancshares, Inc. v. Lowder, supra*, it was found that:

> The legislative history does not suggest whether Congress intended a private right of action. The Act does provide for civil money penalties . . . . However, this is little consolation to the target company whose stock is continually acquired in violation of the [Control Act] . . . . Plaintiffs correctly point out that if defendants may circumvent the requirement of filing notice before the controlling purchases are made, and exercise control by voting those shares, the purpose of the Act is completely defeated.

[1981 Transfer Binder] Fed.Sec.L.Rep. (CCH) at 91,258.

This Court, however, does not find *First Alabama* persuasive. As to the first *Cort* factor, it does not appear that Congress intended, in enacting 12 U.S.C. § 1817(j), to bestow any "especial" benefit upon target banks. The Control Act was promulgated as part of the Federal Institutions Regulatory and Interest Rate Control Act of 1978,

whose purpose was, among other things, to provide added protection to the public and to bank shareholders against anticompetitive practices and insider abuses within the banking industry. *See* H.R.Rep.No.95–1383, 95th Cong. 1st Sess. 7–10 (1978), *reprinted in* [1978] 7 U.S.Code & Admin.News 9273, 9279–9282. Nothing in the legislative history even hints that Congress meant to benefit the banks themselves, much less to give their managers another weapon with which to defend against takeover attempts.

Nor does it appear that the drafters intended to create any private remedies. As the House Report accompanying the Financial Institutions Act pointed out:

> the many hearings and investigations into bank failures and banking problems have supported the need for additional and sharper powers *for Federal supervisory agencies* .... HR 13471 [the Act] gives the agencies four major tools: civil money penalties; improved cease-and-desist authority; improved removal and suspension of insider statutes; and control over changes in control of financial institutions. (Emphasis added.)

*Id.*, H.R.Rep. at 16–17; U.S.Code & Admin. News at 9288–9289. The focus of the legislation is thus upon strengthening the role of the administrative agencies, not diluting it by granting the courts concurrent jurisdiction.

It is also clear that Congress deemed these new agency powers more than adequate to deal with Control Act violations. The FRB apparently may stop an illegal transfer of stock before it takes place by issuing a cease-and-desist order. More importantly, it may effectively force recission of an illegal acquisition that has already occurred by imposing upon any violator a cost of $10,000 for each day that the violation continues. Notwithstanding the views expressed in *First Alabama*, this Court finds the administrative remedies provided by the Control Act to be more than just "little consolation" to persons aggrieved under the statute. District Court intervention is thus unnecessary to effectuate the underlying legislative purpose of 12 U.S.C.

§ 1817(j). Allowing plaintiff to press its claims in this Court would run counter to the enforcement scheme envisioned by the drafters. Plaintiff has thereby failed to satisfy *Cort* factors two and three.

Likewise, plaintiff cannot prevail on the fourth factor. The federal government has traditionally exercised wide control over the banking industry, and state court involvement in this area has been minimal. *Accord, First Alabama, supra.*

Based on this analysis of the requirements outlined in *Cort v. Ash*, this Court declines to follow the lead of *First Alabama* and holds instead that no private cause of action exists under the Change in Bank Control Act of 1978. Plaintiff American has thus failed in Counts One and Three of the complaint to state a cognizable claim against defendants.

## IV

In light of the foregoing, the Court finds itself without jurisdiction to entertain any of the claims made by plaintiff. Defendants' motions to dismiss are thereby GRANTED, and the case shall be DISMISSED forthwith.