**AMERIBANC INVESTORS
GROUP, Plaintiff,**

v.

**Peter S. ZWART, individually and as Voting Trustee of Ameribanc Investors Group Voting Trust, and Gijsbert Verheul, Defendants.**

**Civ. A. 88–1407–A.**

United States District Court,
E.D. Virginia,
Alexandria Division.

March 1, 1989.

David G. Fiske, Anthony J. Trenga, Garth M. Wainman, B. Lee Willis, Alexandria, Va., for plaintiff.

Geoffrey J. Vitt, Alexandria, Va., for defendants.

## MEMORANDUM OPINION

ELLIS, District Judge.

### Introduction

This suit is the latest skirmish in a continuing corporate control struggle. The object of the struggle is control of Ameribanc Investors Group ("AIG"), a Maryland business trust that owns all the stock of Ameribanc Savings Bank (the "Savings Bank"), a federally insured stock savings bank organized under Virginia's laws. The antagonists in this struggle are, on the one side, a majority of the plaintiff's board, who sue here in the name of AIG. Arrayed on the other side are a voting trust and two individuals. The voting trust, Ameribanc Investors Group Voting Trust (the "Voting Trust"), is organized under the laws of the Netherlands. Its current members are the beneficial owners of 39.5% of the outstanding shares of AIG. Zwart, a resident of Belgium, is the Voting Trustee of the Voting Trust, as well as a Trustee of AIG and the former Chairman of AIG's Board of Trustees. Verheul, a citizen of the Netherlands, is also a member of AIG's Board of Trustees.

Plaintiff's complaint is in five counts. The first two counts assert causes of action under Section 14(a) of the Securities Exchange Act, 15 U.S.C. § 78n (1981 & Supp. 1988), for allegedly false and misleading statements in proxy materials. Count I seeks legal and equitable relief, while Count II seeks declaratory relief concerning the consequences of the false and misleading proxy material. Counts III and IV allege private causes of action under the Change in Savings and Loan Control Act, 12 U.S.C. § 1730(q) (1980 & Supp.1988) ("CCA") and the Savings and Loan Holding Company Act, 12 U.S.C. § 1730(a) (1980 & Supp.1988) ("HCA"), respectively. Finally Count V alleges that Zwart and Verheul breached fiduciary duties owed AIG. Defendants move to dismiss all counts of the complaint (i) for failure to state a claim on which relief can be granted under Rule 12(b)(6), Fed.R.Civ.P., (ii) for lack of standing pursuant to Rule 12(b)(1), Fed.R.Civ.P., and (iii) on the basis of the abstention doctrine. Defendants' motion raises questions, not yet decided in this Circuit, concerning whether private causes of action can be implied in these circumstances under Section 14(a), the HCA and the CCA. For the reasons stated in this Memorandum Opinion, the Court concludes that Counts I, II and V[1] survive defendants' threshold attack, but Counts III and IV do not.

### Background

The Voting Trust was formed in 1981 for the purpose of holding and voting shares of AIG. It is composed of 52 AIG shareholders who, for the most part, invested in AIG in 1980 at the recommendation of Zwart through his Swiss investment advisory company, GIM Compagnie d'Investissments, S.A., Geneva ("GIM"). Investors advised by GIM originally acquired a majority of AIG,[2] resulting at the time in an injection of new capital into the company. Not all of these investors joined the Voting Trust. Currently, the 52 Voting Trust members are collectively the beneficial owners of 2,424,717 shares of AIG, representing approximately 39.5% of AIG's outstanding shares. The original Voting Trustee of the Voting Trust was GIM; it is currently Zwart. Under the Voting Trust agreement, prior to AIG shareholder meetings, all issues to be voted on by AIG shareholders are submitted first to Voting

---

**1.** Defendants assert that this Court should abstain from considering the breach of fiduciary duty claims brought against Zwart and Verheul. The Court concludes that abstention is not required. *See Colorado River Water Conservation Dist. v. United States*, 424 U.S. 800, 96 S.Ct. 1236, 47 L.Ed.2d 483 (1976); *Kruse v. Snowshoe Co.*, 715 F.2d 120 (4th Cir.1983), *cert. denied*, 465 U.S. 1065, 104 S.Ct. 1413, 79 L.Ed.2d 739 (1985). Therefore, Count V survives. The abstention

question did not raise any novel issues of law and will not be analyzed in this opinion. It is mentioned only to give a complete picture of the Court's resolution of the motion.

**2.** AIG was originally named Mortgage Investors of Washington. It was renamed AIG in October, 1985.

Trust members for a vote. The Voting Trustee is then required to vote all Voting Trust shares in accordance with the majority vote of the Voting Trust Members.

In 1981, pursuant to Section 13(d) of the Securities Exchange Act, 15 U.S.C. § 78m(d) (Supp.1988), the Voting Trust members, and some other investors acting in concert with the Trust,[3] reported their holding to the Securities and Exchange Commission ("SEC").[4] This group, the Voting Trust and those AIG investors acting in concert with it (the "13D Group"), have continued to the present time to make such reports to the SEC.

AIG acquired the Savings Bank in September, 1984. In connection with that transaction, AIG obtained from the Federal Home Loan Bank Board (FHLBB) the requisite registered holding company status under the HCA. Because it controlled in excess of 25% of AIG's shares, the Voting Trust also submitted an application to obtain that status under the HCA. AIG, in its Amended Complaint, alleges that the Voting Trust represented to the FHLBB that its only purpose was to act as a proxy for its members, that it was not an operating entity and that it was not a "control device" under federal laws relating to Savings and Loan holding companies. *See* 12 U.S.C. § 1730a(a)(2) (1980). The Amended Complaint flatly asserts that the Voting Trust has never received the FHLBB's approval to control AIG. Defendants contend otherwise. Of course, for purposes of the instant motion, the Court accepts, *arguendo,* AIG's allegations on this issue.[5]

In the fall of 1985, Zwart and various other AIG shareholders, including Voting Trust members, apparently decided to explore various opportunities for disposing of their shares. In this connection, Zwart solicited Voting Trust members and certain other AIG shareholders to enter into agreements with GIM ("Representation Agreements") whereby each shareholder authorized GIM to explore and consider various courses of action with respect to disposing of their AIG shares for not less than $12.00 per share. The Representation Agreement further provided that GIM would receive a fee equal to 5% of the value received from the shares of the signatories in the event of a sale. If no sale or disposition occurred, GIM would nonetheless be paid for its services and expenses up to 25% of the value of the signatories' shares. The Amended Complaint alleges that the Representation Agreements were intentionally kept secret from AIG's trustees and transferred to GIM dispositive power over at least 25% of AIG's shares.

In or about July 1986, and prior to the disclosure of the Representation Agreements to the Trustees, Zwart presented the Board of Trustees with a proposal for the sale of all of the AIG shares to NCNB Corporation, a North Carolina bank holding company. The Amended Complaint alleges that Zwart did not disclose to the Trustees that GIM had solicited this proposal or that Zwart might benefit through a fee paid to GIM in the event the proposal was consummated. The Trustees, including Zwart and Verheul, approved the proposal in principle. According to the Amended Complaint, this approval was predicated on the perception that the deal would be "quick and clean." This allegedly turned out not to be the case, and the Trustees ultimately conclud-

---

3. As noted, not all of the original AIG investors advised by Zwart elected to join the Voting Trust. Yet some continued to act in concert with the Trust.

4. Section 13(d) requires any "person" owning more than five percent of a public company's securities to file a Schedule 13D with the SEC. The term person include two or more persons who act together for a common purpose. *See Financial General Bankshares, Inc. v. Lance,* Fed.Sec.L.Rep. (CCH), ¶ 96,403 (D.D.C.1978) [1978 WL 1082]. The purpose of this filing requirement is to provide both the SEC and other investors with information concerning the purpose of the acquisition of the securities. *Florida Commercial Banks v. Culverhouse,* 772 F.2d 1513, 1515 (11th Cir.1985).

5. *See Scheuer v. Rhodes,* 416 U.S. 232, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974); *Edwards v. Duncan,* 355 F.2d 993 (4th Cir.1966); *Canty v. City of Richmond, Va., Police Dept.,* 383 F.Supp. 1396 (E.D.Va.1974), aff'd, 526 F.2d 587 (4th Cir.1975), cert. denied sub nom, *Canty v. Brown,* 423 U.S. 1062, 96 S.Ct. 802, 46 L.Ed.2d 654 (1976); *Bradley v. Carydale Enter.,* 707 F.Supp. 217, 218 n. 2 (E.D.Va.1989).

ed, unanimously, to reject the agreement offered by NCNB.

During 1986, the Trustees considered two other transactions allegedly designed to enhance the marketability of AID shares and its desirability as an investment.[6] This, too, occurred prior to the disclosure to the Trustees of the Representation Agreements. Zwart opposed both transactions.

In August 1988, the Trustees retained Merrill Lynch Capital Markets ("Merrill Lynch") to act as AIG's financial advisor and to develop a plan accessing AIG's strategic alternatives, including merger or sale. The Amended Complaint alleges that Zwart voted against retaining Merrill Lynch and did not disclose to the Trustees his own competing plan reflected in the Representation Agreements.

On September 9, 1988, according to the Amended Complaint, Zwart and Verheul disseminated proxy materials to members of the Voting Trust. These materials asked the existing Voting Trust members, and those shareholders who acted in concert with the Voting Trust, to execute an "Agreement and Authorization" and to attend a meeting of the Voting Trust to be held on September 16, 1988. The meeting's proposed purpose was to approve a subsequent solicitation of all AIG shareholders to win their approval to reconstitute the Board and wrest control of AIG from the existing Trustees. Zwart sought authorization to vote all Voting Trust shares in favor of recomposition, which called for the removal of all current Board members except for Zwart and Verheul, reduction of the Board's size from thirteen to five, and the addition of three new Trustees selected by Zwart and Verheul. The new Board would then seek to sell AIG. As part of this effort, the AIG shareholders who acted in concert with the Voting Trust were asked to deposit their shares in the Voting Trust in exchange for assignable trust certificates and to execute an "Agreement to Join Voting Trust." Under this agreement, their transfer of shares into the Voting Trust would be effective only if and when the Voting Trust approved the solicitation of all AIG shareholders.

On September 16, 1988, the Voting Trust met and authorized Zwart to proceed with the solicitation of all AIG shareholders and the recomposition of the Board of Trustees. The Amended Complaint asserts that the proxy materials used in obtaining the Voting Trust's approval were false and misleading because they:

(1) misrepresented the Board's position on a variety of issues, most notably as being opposed to the sale of the Savings Bank;

(2) misrepresented the state and federal regulatory obstacles to reorganizing the Board and selling the Savings Bank;

(3) failed to disclose the potential benefits to Zwart of the sale of AIG;

(4) failed to disclose that Zwart and Verheul may have breached their fiduciary duties to the Voting Trust and AIG;

(5) misstated the current market for the sale of a publicly traded thrift institution; and

(6) failed to disclose Zwart's and Verheul's management plans for the Savings Bank in the event no purchaser could be found.

This suit followed the Voting Trust's September 16 meeting and vote.

### Analysis

Defendants assert that this action must be dismissed because:

(1) there is no implied private right of action for target companies under Section 14(a); and

(2) there is no implied private right of action at all under the HCA and the CCA.

This Court concludes that a private right of action should be implied for target companies under Section 14(a) but not under either under either the HCA or the CCA.

A. *Section 14(a)*

■ *Cort v. Ash,* 422 U.S. 66, 95 S.Ct. 2080, 45 L.Ed.2d 26 (1975), is the starting

---

**6.** The Amended Complaint does not disclose the nature of these two transactions.

point for determining whether private rights of action should be implied. *Cort* set out four factors to be considered in this determination:

1. Is the plaintiff one of the class for whose especial benefit the statute was enacted ... that is, does the statute create a federal right in favor of the plaintiff?;

2. Is there any indication of legislative intent, explicit or implicit, either to create such a remedy or deny one?;

3. Is it consistent with the underlying purposes of the legislative scheme to imply such a remedy for the plaintiff?;

4. Is the cause of action one traditionally relegated to state law in an area basically the concern of the States, so that it would be inappropriate to infer a cause of action based solely on federal law?

*Id.* at 73, 95 S.Ct. at 2086. The *Cort* factors are a formula for deriving legislative intent in this context. They are not, however, entitled to equal weight. The analysis of statutory language and legislative history are the decisive factors. *See Newcome v. Esrey*, 862 F.2d 1099, 1103 (4th Cir.1988). Indeed, even if the first and fourth *Cort* factors are met, unless the second and third factors suggest congressional intent to imply a private right of action, " 'the essential predicate for implication of a private remedy simply does not exist.' " *Massachusetts Life Insurance Co. v. Russell*, 473 U.S. 134, 145, 105 S.Ct. 3085, 3092, 87 L.Ed.2d 96 (1985) (quoting *Northwest Airlines, Inc. v. Transport Workers Union*, 451 U.S. 77, 94, 101 S.Ct. 1571, 1582, 67 L.Ed.2d 750 (1981)).

It is well settled that stockholders have a private remedy against issuers of allegedly false or misleading proxies under Section 14(a). *J.I. Case Co. v. Borak*, 377 U.S. 426, 431, 84 S.Ct. 1555, 1559, 12 L.Ed.2d 423 (1964). Not so well settled is whether that right extends to target companies. The *Borak* court did not reach this issue. But shortly after *Borak*, the Second Circuit concluded that target companies have such a right of action. *Studebaker Corp. v. Gittlin*, 360 F.2d 692, 695 (2d.Cir.1966) (Friendly, J.). Other courts followed *Studebaker* and recognized a Section 14(a) private right of action for target companies.[7] Defendants resist this result, asserting that *Cort* discredited *Studebaker* and its progeny. They contend that no such right exists for the target company because the target company is not a member of the "class for whose especial benefit the statute was enacted ..." *Cort*, 422 U.S. at 73, 95 S.Ct. at 2086. While the parties agree that a private right of action exists under Section 14(a), they disagree over whether, given *Cort*, that private right of action extends to the target company. Therefore, the parties dispute whether the first *Cort* factor is met.

The question is a close one and not wholly free from doubt. Ultimately decisive is Judge Friendly's analysis of Section 14(a)'s legislative history in the *Studebaker* opinion. He concluded that:

the legislative history shows that Congress anticipated protection [under Section 14(a)] from "irresponsible outsiders seeking to wrest control of a corporation away from honest and conscientious corporation officials." S.Rep. No. 1455, 73d Cong., 2d Sess. 77 (1934), and the Proxy Rules are shot through with provisions recognizing that in contests for control the management has a role to play as such and not merely insofar as the managers are stockholders.

*Studebaker Corp.*, 360 F.2d at 695 (citations omitted). Judge Friendly correctly concluded that target companies were empowered to sue for Section 14(a) violations.[8]

---

**7.** *See, e.g. General Time Corp. v. Talley Indus., Inc.,* 403 F.2d 159, 161 (2d Cir.1968), *cert. denied,* 393 U.S. 1026, 89 S.Ct. 631, 21 L.Ed.2d 570 (1969); *Greater Iowa Corp. v. McLendon,* 378 F.2d 783, 794 (8th Cir.1967); *Bound Brook Water Co. v. Jaffe,* 284 F.Supp. 702, 705 (D.N.J. 1968); *Calumet Indus., Inc. v. MacClure,* 464 F.Supp. 19, 28 (N.D.Ill.1978); *Reserve Management Corp. v. Anchor Daily Income Fund, Inc.,*

459 F.Supp. 597, 607 (S.D.N.Y.1978); *In re Haas,* 36 B.R. 683, 690 (N.D.Ill.1984).

**8.** *Borak* may be viewed as having implicitly approved this conclusion by its explicit approval of shareholder derivative suits. 377 U.S. at 431, 84 S.Ct. at 1559. In some states, notably Delaware, a corporation may assume the prosecution of a shareholder derivative suit. In these

Nor is the legislative history the only sign pointing persuasively to this conclusion; target company standing is fully consistent with Section 14(a)'s underlying purpose. That purpose is "to promote the 'free exercise of the voting rights of shareholders' by ensuring that proxies would be solicited with 'explanation to the stockholder of the real nature of the questions for which authority to case his vote is sought.'" *Mills v. Electric Auto–Lite Co.*, 396 U.S. 375, 381, 90 S.Ct. 616, 620, 24 L.Ed.2d 593 (1970) [quoting H.R.Rep. No. 1383, 73d Cong., 2d Sess. 13]. How better to promote this purpose than to entrust the enforcement of the section, at least in part, to the entity best equipped and motivated to detect proxy statement errors? Conferring on target companies a right to sue under Section 14(a) helps insure prompt detection and correction of proxy statement errors. *Florida Commercial Banks v. Culverhouse*, 772 F.2d 1513 (11th Cir.1985) is instructive in this regard. In *Culverhouse*, a target corporation sought corrective disclosure of information contained in a tender offer under the Williams Act.[9] The *Culverhouse* court, in finding an implied private right of action for target companies under the Williams Act, noted that:

> [i]n most cases, shareholders simply cannot protect their own interests; they lack the resources to confirm the accuracy of information. ... The SEC cannot police every tender offer or major acquisition subject to the Williams Act. The issuer is frequently in the best position to seek corrective disclosures within a time frame that will optimize the benefit to shareholders of such disclosures. We conclude that it is necessary to grant this private right of action to issuers in order to insure for the Williams Act to be effective.

*Id.* at 1519. The factors relied on in *Culverhouse* apply with equal force to Section 14(a) of the Securities Exchange Act. Target companies are in the best position to police proxy solicitations and seek prompt corrective disclosure. Therefore, standing for target companies helps guarantee the effectiveness of shareholder democracy.

Defendants claim *Piper v. Chris–Craft Ind., Inc.*, 430 U.S. 1, 32 n. 21, 97 S.Ct. 926, 944 n. 21, 51 L.Ed.2d 124 (1977), mandates a different result. In *Piper*, the Supreme Court held that Section 14(e) of the Williams Act, 15 U.S.C. § 78n(e) (1981), did not create a private right of action for tender-offerors. In dissent, Justice Stevens argued that since the *Borak* court had found that a private right of action did exist for the corporation through a shareholder derivative suit,[10] and since "it seems clear that the primary beneficiaries of [Section 14(a)] were individual stockholders rather than corporations ..., *Borak* itself does not meet the [*Piper*] majority's 'especial class' test." *Id.* 430 U.S. at 66, 97 S.Ct. at 961. The *Piper* majority responded in a footnote that the derivative suit benefits:

> 'stockholders as a group.' The *Borak* Court was thus focusing on all stockholders—the owners of the corporation—as the beneficiaries of § 14(a). Stockholders as a class therefore plainly constituted the 'especial class' for which the proxy provisions were enacted.

*Id.* at 32 n. 21, 97 S.Ct. at 944 n. 21 [quoting *Borak*, 377 U.S. at 432, 84 S.Ct. at 1559]. This footnote, defendants argue, invites the inference that corporations themselves are not members of Section 14(a)'s "especial class." Therefore, according to defendants, *Piper* undercuts *Studebaker*'s holding on target company standing. This argument is unpersuasive. The *Piper* footnote is ambiguous and clearly dicta, since the issue there was tender-of-

---

circumstances, the company's standing would not be in doubt.

**9.** Sections 13(d), 14(d) and 14(e) of the Securities Exchange Act are collectively referred to as the "Williams Act" Amendments. 15 U.S.C. § 78m(d), 78n(d) & 78n(e) (1981 & Supp.1988). The Williams Act was adopted by Congress in 1968 to provide investors with information

about cash tender offers. *See Florida Commercial Banks v. Culverhouse*, 772 F.2d 1513, 1515 (11th Cir.1985).

**10.** *Piper v. Chris–Craft Ind., Inc.*, 430 U.S. 1, 66 n. 18, 97 S.Ct. 926, 962 n. 18, 51 L.Ed.2d 124 (1977) [quoting *Borak*, 377 U.S. at 431, 84 S.Ct. at 1559].

feror standing, not target company standing. Moreover, if defendants' interpretation of the *Piper* footnote were correct, surely subsequent Section 14(e) decisions would have barred target companies from pursuing corrective disclosures. Yet, every court that has considered the issue since *Piper* has found that a target company had standing under Section 14(e) to pursue corrective disclosures.[11] These courts reached this result because they concluded that "it is necessary to grant this private right of action to issuers in order for the Williams Act to be effective." *Culverhouse*, 772 F.2d at 1519.[12] Similarly, a private right of action for target companies under Section 14(a) ensures that this Section remains an effective deterrent to misstatements in Proxy statements.

## B. *The Holding Company Act*

■ The HCA makes it unlawful for a purchaser to acquire control of a savings and loan whose accounts are insured by the Federal Savings and Loan Insurance Corporation (FSLIC) without first obtaining prior written approval by the Federal Home Loan Bank Board (FHLBB). 12 U.S.C. § 1730a (1980 & Supp.1988). Under the HCA, the FHLBB reviews the prospective purchase to determine whether it would be detrimental to the savings and loan or the insurance risk of the FSLIC. *Id.* at § 1730a(e)(1)(B). The FHLBB also considers community needs and whether the purchase would jeopardize competition. 12 C.F.R. § 574.7(c) (1988). In short, the primary goal of the HCA "seems to have been [to provide] the regulators of financial institutions with information and authority concerning changes in control." *Ameri-west Financial Corp. v. Sowell,* Civ. 85–1277, Memorandum Op. at 13 (D.N.M. Oct. 4, 1985) [1985 WL 5164]. Armed with this information, the regulator is empowered under the HCA to determine whether proposed changes in control of thrift institutions would adversely affect the FSLIC, the community or competition.

These purposes, together with the HCA's legislative history, demonstrate that implication of a private cause of action does not comport with congressional intent. As the legislative history reflects, HCA regulation of savings institution purchases was plainly intended to be limited in nature:

> [The applicable portions of the HCA] make clear the limited nature of the [FSLIC's] concern with the sale of an association to an acquiring company. Corporations that are undercapitalized or financially strained or in the hands of management of doubtful competence or integrity would be barred from taking over an insured institution. On the other hand, the Corporation is directed to approve transactions and companies free from such infirmities.

1968 U.S.Code Cong. & Admin. News 1612. Congress recognized the "positive competitive aspects of the holding company device for the thrift industry ... [rules promulgated under the HCA should] be designed to facilitate and encourage the holding company device as a constructive and responsible competitive instrument." *Id.* at 1617 (statement of Congressman Hanna). This intent to limit the scope of the HCA militates persuasively against implying an HCA private right of action. To hold oth-

---

**11.** *See, e.g. Dan River., Inc. v. Unitex, Ltd.,* 624 F.2d 1216 (4th Cir.1980), *cert. denied,* 449 U.S. 1101, 101 S.Ct. 896, 66 L.Ed.2d 827 (1981); *Indiana National Corp. v. Rich,* 712 F.2d 1180 (7th Cir.1983); *Chromalloy American Corp. v. Sun Chemical Corp.,* 611 F.2d 240 (8th Cir.1979); *Pacific Realty Trust v. APC Investments, Inc.,* 685 F.2d 1083 (9th Cir.1982); *Florida Commercial Banks v. Culverhouse,* 772 F.2d 1513 (11th Cir. 1985).

**12.** Defendants reliance of *Liberty National Ins. Holding Co. v. Charter Co.,* 734 F.2d 545 (11th Cir.1984), is misplaced. In *Liberty National,* the target issuer was denied standing to pursue a claim for damages. Damages are tangential to the underlying purposes of the Williams Act in "protecting shareholders who must decide whether to tender or retain their stock." *Piper,* 430 U.S. at 42, 97 S.Ct. at 949. Following the *Liberty National* decision, the Eleventh Circuit found that the target issuer has standing to pursue a claim for corrective disclosure because corrective disclosure serves the underlying purposes of the Williams Act. *Florida Commercial Banks v. Culverhouse,* 772 F.2d 1513 (11th Cir. 1985). In the case at bar, plaintiff seeks corrective disclosure, not damages. As in *Culverhouse,* corrective disclosure here serves the underlying purposes of Section 14(a).

erwise would expand the scope of the HCA well beyond that Congress contemplated. It would also undermine Congress' desire to ensure prompt agency action. Under the HCA, decisions must be made in ninety days. Creating a private cause of action for target companies may well frustrate this goal, while contributing little, if anything, to HCA's other objectives. As noted in *Financial Corp. of Santa Barbara v. Dayco Corp.*, CV 80–2918–RJX, Memorandum Op. at 11 (C.D.Cal. Sept. 25, 1980), in analyzing the HCA:

> Congress foresaw the need for prompt action by an administrative body with expertise, rather than use of prolonged judicial proceedings wherein the Court would be required to consider detailed matters regarding savings and loan business structure and operations as such relate to the health of the association.

Moreover, providing target companies with a private right of action under the HCA may be inconsistent, in certain circumstances, with HCA's goal of promoting competition. Given such a private right, target companies would then have a powerful weapon to attempt to block pro-competitive acquisitions. This result would be antithetical to HCA's goals. One court recognized the anti-competitive potential of an HCA private right of action for target companies. In *AmeriWest Financial Corp. v. Sowell*, No. 85–1277 (D.N.M. Oct. 4, 1985), the court noted in reviewing the HCA provisions:

> there is no indication that Congress intended the change in control provisions (the HCA or CCA) to be another weapon

for an existing board of directors or management to use in a proxy solicitation or defending against a takeover attempt.

*Id.*, Memorandum Op. at 16; *see also Financial Corp. v. Dayco Corp.*, No. 80–2918 RJX, Memorandum Op. at 10–11 (C.D. Cal. Sept. 25, 1980) (same principle).[13]

Not surprisingly, the parties have found no reported decisions approving an HCA private right of action. The Court, too, has found none. Instead, research discloses that courts, under the similar Bank Holding Company Act ("BHCA"),[14] have uniformly held that no private right of action is to be implied from that statute.[15] For example, the court in *Marx v. Centran Corp.*, 747 F.2d 1536 (6th Cir.1984), *cert. denied*, 471 U.S. 1125, 105 S.Ct. 2656, 86 L.Ed.2d 273 (1985), found that the BHCA:

> was intended to add flexibility to the [Federal Reserve] Board's enforcement powers, not to create a federal right in favor of national banking associations and their shareholders.... [I]nferring a cause of action [under BHCA] would be inconsistent with, indeed disruptive of, the legislative scheme.

*Id.* at 1550.

Plaintiff's argument for the existence of a private right of action under the HCA relies chiefly on the FHLBB's determination that such a right of action is consistent with legislative intent. 50 Fed.Reg. 48707–09 (Nov. 26, 1985). To be sure, deference to an agency's construction of statutes they administer is appropriate in matters

---

**13.** Since neither the second or third *Cort* factors are met, this Court need not determine whether a private right of action under the HCA satisfies the first and fourth *Cort* factors. *Newcome v. Esrey*, 862 F.2d 1099, 1103 n. 8 (4th Cir.1988); *In re Washington Public Power Supply System Securities Litigation*, 823 F.2d 1349, 1354 (9th Cir.1987) (en banc).

**14.** The Bank Holding Company Act states that: It shall be unlawful except with the prior approval of the [Federal Reserve] Board ... for any bank holding company to acquire direct or indirect ownership or control of any voting shares of any bank, if, after such acquisition, such company will directly or indirectly con-

trol more than 5 per centum of the voting shares of such bank.
12 U.S.C. § 1842(a) (1980). The Federal Reserve Board in determining whether approval is appropriate is to consider the resources of the acquiring company, the community needs and whether the acquisition is anti-competitive. 12 U.S.C. § 1842(c) (Supp.1988).

**15.** *See, e.g. Marx v. Centran Corp.*, 747 F.2d 1536, 1548–50 (6th Cir.1984), *cert. denied*, 471 U.S. 1125, 105 S.Ct. 2656, 86 L.Ed.2d 273 (1985); *Quaker City National Bank v. Hartley*, 533 F.Supp. 126, 127 (S.D.Ohio 1981); *Centerre Bancorporation v. Kemper*, 682 F.Supp. 459, 461 (E.D.Mo.1988).

committed to their discretion.[16] In this instance, however, that is not the case; the existence or non-existence of a private right of action is not a matter committed to the FHLBB's administrative expertise. On the contrary, the implication of a private right of action is a sharply focused legal issue committed to the courts, not agencies. Under these circumstances, the FHLBB's interpretation is of limited value. As the Supreme Court noted, agency interpretation is of little significance "when the narrow legal issue is one peculiarly reserved for judicial resolution, namely whether a cause of action should be implied by judicial interpretation in favor of a particular class of litigants." *Piper v. Chris-Craft Ind., Inc.,* 430 U.S. at 41 n. 27, 97 S.Ct. at 949 n. 27. With all due respect to the FHLBB, this Court's application of the *Cort* factors to the HCA leads to the conclusion that no private right should be implied. While a private right of action under the HCA may have plausible policy advantages, they are not reflected in the statute, its structure or its legislative history. Instead, the opposite is true. If the FHLBB is persuaded that an HCA private cause of action would be useful, it should address its arguments to Congress.

## C. The Change in Savings and Loan Control Act

■ The CCA was enacted to give federal supervisory agencies "power to monitor and regulate takeovers of Federally-insured institutions." H.R.Rep. No. 95–1383, 95th Cong., 2d Sess. 4, *reprinted in,* 1978 U.S.Code Cong. & Admin. News 9273, 9276. Under the CCA, no party may acquire control of a federally insured thrift institution without first providing 60 days advance notice and certain information to the FHLBB. 12 U.S.C. § 1730(q)(1) (Supp. 1988). Armed with this information, the FHLBB is required to consider the following questions: (1) will the acquisition tend to restrain competition; (2) does the ac-

quiring person's background indicate that the purchase would be in the best interest of the depositors and general public; and (3) does the acquirer's financial condition jeopardize the thrift's financial stability or prejudice the depositor's interests. 12 U.S.C. § 1730(q)(7)(A)–(D) (1980).

Defendants correctly argue that implication of a private right of action from the CCA is unwarranted. Congress, alarmed by the outbreak of thrift takeovers, enacted CCA to give *regulators,* not private individuals, the power to review purchases. As Congress noted, "[c]learly, statutory language is needed to give *financial institution regulators* authority over such transfers of banks, savings and loans, and holding companies." 1978 U.S.Code Cong. & Admin. News 9292 (emphasis added). Therefore, the CCA's sharp focus is on federal regulatory supervision, not private party litigation. "Your Committee ... has developed statutory language which will accomplish the objective of giving the regulatory agencies meaningful powers over transfers of ownership of depository institutions and their holding companies." *Id.* Congress' intent was to provide the FHLBB "with the same power to disapprove proposed acquisitions of insured stock institutions or their holding companies ... that Federal banking agencies are granted...." *Id.* at 9320. In sum, the legislative history convincingly demonstrates that Congress did not intend to create a private right of action for target companies. As one court put it, the legislative history and underlying purposes of the CCA simply do "not support an implied private right of action and make it appear that change in control enforcement was placed exclusively in the federal financial regulatory agencies." *Ameriwest Financial Group v. Sowell,* No. 85–1277, Memorandum Op. at 15 (D.N.M. Oct. 4, 1985).

In addition, the CCA itself demonstrates that the public's recourse was to the FHLBB, not the courts. Thus, the CCA

---

**16.** *See, e.g. United States v. Riverside Bayview Homes, Inc.,* 474 U.S. 121, 131, 106 S.Ct. 455, 461, 88 L.Ed.2d 419 (1985); *Chevron U.S.A. v. Natural Resources Defense Council, Inc.,* 467 U.S. 837, 844, 104 S.Ct. 2778, 2782, 81 L.Ed.2d 694 (1984); *Federal Election Commission v. Democratic Senatorial Campaign Committee,* 454 U.S. 27, 37, 102 S.Ct. 38, 45, 70 L.Ed.2d 23 (1981).

provides for public comment. The FHLBB is required to publish the name of the purchaser and "solicit public comment on such proposed acquisitions, particularly from persons in the geographic area where the institution proposed to be acquired is located, before final consideration of such notice by the Corporation." 12 U.S.C. § 1730(q)(2)(D)(ii) (Supp.1988). This opportunity to participate in the administrative process is the sole express remedy for private parties. It is a well-settled principle of statutory construction that when a statute provides individuals with an express remedy, it is improper to imply a private remedy. This principle was succinctly stated by the Supreme Court in *National R.R. Passenger Corp. v. National Ass'n of R.R. Passengers*, 414 U.S. 453, 94 S.Ct. 690, 38 L.Ed.2d 646 (1974):

> A frequently stated principle of statutory construction is that when legislation expressly provides a particular remedy or remedies, courts should not expand the coverage of the statute to subsume other remedies. "When a statute limits a thing to be done in a particular mode, it includes the negative of any other mode."

*Id.* at 458, 94 S.Ct. at 693 [quoting *Botany Worsted Mills v. United States*, 278 U.S. 282, 289, 49 S.Ct. 129, 132, 73 L.Ed. 379 (1929)]; *see also T.I.M.E. Inc. v. United States*, 359 U.S. 464, 79 S.Ct. 904, 3 L.Ed. 2d 952 (1959) (same principle). Creating a CCA private remedy would violate this basic principle of statutory construction. Apart from this, implication of a private right of action under the CCA would under-

mine the statutory goal of completing agency review in sixty days. 12 U.S.C. § 1730(q)(1) (Supp.1988). Moreover, as in the case of the HCA, implication of a CCA private right of action for a target company would likely have anti-competitive effects. The CCA was not intended to have such effects. To the contrary, CCA requires that the FHLBB reject acquisitions likely to be anti-competitive unless the public interest in the acquisition clearly outweighs its anti-competitive aspects. 12 U.S.C. § 1730(q)(7)(B) (1980). In sum, implication of a private right of action under the CCA conflicts with the express statutory language and the canon of statutory interpretation.

A number of courts have considered the propriety of implying a private right of action under the CCA or its sibling, the Change in Bank Control Act, 12 U.S.C. § 1817(j)(1) (Supp.1988).[17] While three early cases found implication of a private right of action to be appropriate,[18] more recent decisions have rejected the implication of such a right.[19] The Court finds these later cases more persuasive. Plaintiff also relies on the FHLBB determination that an implied private right of action would aid the underlying purposes of the CCA. 50 Fed. Reg. 48707–09 (Nov. 26, 1985). The Court's prior discussion [20] of the deference owed to the FHLBB's opinion regarding the HCA is equally applicable here. The Court concludes that the FHLBB's opinion must be rejected.

In sum, implication of a private right of action under the CCA does not meet the *Cort* requirements. There is simply no in-

**17.** Like the CCA, the Change in Bank Control Act provides that "[n]o person ... shall acquire control of any insured bank ... unless the appropriate Federal banking agency has been given sixty days' prior written notice of such proposed acquisition...." 12 U.S.C. § 1817(j)(1) (Supp.1988).

**18.** *See AmeriWest Financial Corp. v. Veale*, No. 84–0244 (D. N.M.1984); *Mid–Continent Bancshares, Inc. v. O'Brien*, [1982 Transfer Binder] Fed.Sec.L.Rep. (CCH) ¶ 98,734 (E.D.Mo.1981) [1981 WL 1404]; *First Alabama Bancshares, Inc. v. Lowder*, [1981 Transfer Binder] Fed.Sec.L. Rep. (CCH) ¶ 98,015 (N.D.Ala.1981) [1981 WL 1638].

**19.** *Ameriwest Financial Corp. v. Sowell*, Civ. No. 85–1277 (D.N.M. Oct. 4, 1985) (expressly rejecting *Ameriwest Financial Corp. v. Veale*, No. 84–0244 (D.N.M.1984)); *Gianakas v. Siensa*, 649 F.Supp. 1033 (N.D.Ill.1986) (expressly criticizing *Mid–Continent Bancshares, Inc. v. O'Brien*, [1982 Transfer Binder] Fed.Sec.L.Rep. (CCH) ¶ 98,734 (E.D.Mo.1981)); *Quaker City Nat. Bank v. Hartley*, 533 F.Supp. 126 (S.D. Ohio 1981); *Flagship Banks, Inc. v. Smathers*, No. 81–713–Civ.–EPS (S.D.Fla. July 22, 1981); *Financial Corp. of Santa Barbara v. Dayco Corp.*, CV 80–2918–RJX (C.D.Cal. Sept. 25, 1980).

**20.** *See supra* note 16 and accompanying text.

**1258**

dication that the legislature intended to create a private right of action under the CCA. Application of the *Cort* requirements shows the contrary.

*Conclusion*

For the reasons stated above, Defendant's motion to dismiss is granted as to Counts III and IV, and denied as to Counts I, II and V. An appropriate Order has been entered.