FAR WEST FEDERAL BANK, S.B., et al., Plaintiffs,

v.

DIRECTOR, OFFICE OF THRIFT SUPERVISION, et al., Defendants.

Civ. No. 90–103–PA.

United States District Court, D. Oregon.

May 4, 1990.

Barnes H. Ellis, Christine Kitchel, Stoel, Rives, Boley, Jones & Grey, Portland, Or., Wesley G. Howell, Jr., John C. Millian, Gibson, Dunn & Crutcher, Washington, D.C., for plaintiffs.

Stuart M. Gerson, Asst. Atty. Gen., Leslie H. Southwick, Deputy Asst. Atty. Gen., Charles H. Turner, U.S. Atty., Herbert C. Sundby, Asst. U.S. Atty., Brook Hedge, Theodore C. Hirt, Jeffrey S. Gutman, Gary W. Herschman, Dept. of Justice Civil Div., Washington, D.C., for defendant FDIC.

Eugene M. Katz, Acting Chief Counsel, Thomas J. Segal, Associate Chief Counsel, Aaron B. Kahn, Elizabeth R. Moore, Sr. Trial Attys., Office of the Chief Counsel, Washington, D.C., for defendant Director, Office of Thrift Supervision.

## OPINION

PANNER, Chief Judge.

Plaintiffs, Far West Federal Bank (Far West) and a number of its investors (Investors), bring this action against the Director of the Office of Thrift Supervision (OTS), the Federal Home Loan Bank Board (FHLBB), the Federal Home Loan Bank of Seattle (FHLB–Seattle), the Federal Deposit Insurance Corporation (FDIC), and the Federal Savings and Loan Insurance Corporation (FSLIC), for breach of contract and a fifth amendment taking.

On May 2, 1990, plaintiffs moved for a temporary restraining order (TRO) and expedited trial date. On May 3, 1990, I conducted a hearing. After oral argument, I determined that plaintiff had shown the possibility of irreparable harm, there were potentially serious hardships on both sides, and there were strong public interests on both sides. Therefore, the issuance of a TRO hinges on plaintiffs' probability of success on the merits.

I told counsel I would rule on the probability of success on the merits by opinion, on May 4, 1990, and if I ruled for plaintiffs, I would issue a TRO and schedule a preliminary injunction hearing within ten days. I find that plaintiffs have shown a probability of success on the merits and grant their motion for a TRO.

## LEGAL ISSUE PRESENTED

When Congress enacted the Financial Institutions Reform, Recovery and Enforcement Act of 1989 (FIRREA), Pub.L. No. 101–73, 103 Stat. 183 *et seq.* (1989), (codified in scattered sections of 12 U.S.C., hereinafter cited as section of FIRREA) did it intend to abrogate an existing contract between plaintiffs and the OTS predecessor agencies?

## FACTUAL BACKGROUND

There is no dispute about the facts material to resolution of this issue. Far West is a federally chartered stock savings association based in Portland, Oregon. OTS is the successor federal agency to FHLBB, with regulatory authority over thrifts. FHLB–Seattle is one of twelve Home Loan Banks, which operated under FHLBB control before FIRREA. FDIC is the successor agency to FSLIC, which was also under FHLBB. FDIC now insures Far West's deposits.

After losing money while operating as a mutual savings association, Far West entered into a "Supervisory Agreement" with the FHLBB in March, 1985. The Supervisory Agreement imposed certain operating restrictions on Far West, but did not reverse the losses.

In April, 1987, Far West entered into a Consent Agreement with FHLB–Seattle, agreeing to either obtain more capital or merge with another thrift. In September, 1987, Far West applied to the FHLBB for a conversion to a stock savings association from a mutual savings association. At the same time, Far West entered into a Stock Purchase Agreement with the Investors, who agreed to invest $27 million in Far West.

On December 31, 1987, Far West, FHLBB and FHLB–Seattle, reached a "Conversion Agreement". Far West acknowledges that it could not comply with the regulatory capital requirements in effect at the time. The Conversion Agreement contained certain key provisions: 1) the FHLBB approved the conversion to a stock savings association, and granted a forbearance from meeting regulatory capital requirements; 2) FHLB–Seattle provided a line of credit, and waived regulatory liability growth requirements; 3) FHLB–Seattle and FHLBB allowed Far West to account for the line of credit as an identified intangible asset on Far West's books; 4) Far West's capital would be gradually increased over a ten-year operating plan so that at the end of that period, it would fully comply with regulatory capital standards; 5) the Investors would invest $27 million into Far West.

Schedule P of the Conversion Agreement, setting forth the Modified Capital Requirements for Far West, says that the components of regulatory capital will be as defined in certain regulations, "notwithstanding any subsequent changes in the definition of regulatory capital. . . ." The Conversion Agreement binds the successors to the parties.

Congress enacted FIRREA in 1989, as a comprehensive reform of the severely troubled thrift industry. FIRREA abolished the FHLBB and vested regulatory power over the thrift industry in its successor agency, OTS. FIRREA imposes new more stringent capital requirements on thrifts and requires the OTS Director to enforce them. The Director must require thrifts that fail to meet the new capital requirements to submit a compliance plan by January 8, 1990. The plan must be acceptable to the Director. FIRREA gives the Director broad enforcement powers, such as issuance of a cease and desist order, imposition of a conservatorship or receivership, and suspension or removal of officers and directors.

On November 8, 1989, OTS published minimum capital regulations under FIRREA, effective December 7, 1989. OTS

notified Far West that Far West appeared unable to meet the new capital requirements and directed it to show compliance or submit a plan to achieve compliance by December 31, 1994.

In response to the directive for a compliance plan, Far West submitted a plan on January 6, 1990. That plan projects continued compliance with the Conversion Agreement, including its lower capital requirements. On April 24, 1990, OTS sent Far West a letter in response to the plan submitted, stating that the plan is not acceptable and that Far West appears unable to comply with the FIRREA capital requirements. Far West agrees that it cannot comply with the new FIRREA capital requirements for several years.

OTS contends that FIRREA permits it to abrogate the Conversion Agreement and impose the new, more stringent capital requirements. Far West disagrees. Therefore, the factual dispute about Far West's compliance with the Conversion Agreement need not be resolved unless OTS is required to honor the Conversion Agreement.

At the hearing, counsel for plaintiffs agreed that Congress could abrogate the Conversion Agreement, but argued that it did not intend to do so. Counsel for OTS reiterated its position that FIRREA abrogates the Conversion Agreement.

## APPLICABLE PROVISIONS OF FIRREA

FIRREA abolished the FHLBB and established OTS within the Department of the Treasury. FIRREA at §§ 401(a)(2) and 301 sec. 3(a) (*reprinted at* 12 U.S.C. §§ 1437 note, and 1462a.) The OTS Director "may prescribe such regulations and issue such orders as the Director may determine to be necessary for carrying out" FIRREA. *Id.* at § 301 sec. 3(b)(2). The Director has powers previous vested in the FHLBB, that were not otherwise transferred to other agencies or abolished. *Id.* at § 1462a(e).

FIRREA also amended the Home Owners' Loan Act of 1933 (HOLA). FIRREA at § 301. Amended subsection 5(t)(1) of HOLA requires the Director of OTS to promulgate "*uniformly* applicable capital standards for savings associations" (emphasis supplied.) Amended subsection 5(s)(1) of HOLA says that the Director "shall require *all* savings associations to achieve and maintain adequate capital" by establishing minimum capital levels and using other methods determined appropriate (emphasis supplied.)

At section 401, FIRREA transfers functions from the FHLBB to the OTS. In § 401(g), FIRREA provides that:

(1) Existing rights, duties and obligation not affected,—Subsection (a) [abolishing FSLIC and FLHBB] shall not affect the validity of any right, duty or obligation of the United States, the [FHLBB], or any other person which

(A) arises under or pursuant to the Federal Home Loan Bank Act, the Home Owner's Loan Act of 1933, or any other provision of law applicable with respect to such Board ...; and

(B) existed on the day before the date of the enactment of this Act.

In section 401(h), FIRREA provides:

(h) Continuation of orders, resolutions, determinations and regulations.—Subject to section 402, all orders, resolutions, determinations, and regulations, which—

(1) have been issued, made, prescribed, or allowed to become effective by the [FSLIC or the FHLBB] ...; and

(2) are in effect on the date this Act takes effect,

shall continue in effect according to the terms of such orders, resolutions, determinations and regulations and shall be enforceable against ... [the Director of OTS and FDIC] ... as the case may be, until modified, terminated, set aside, or superseded in accordance with applicable law by the [Director of OTS or the FDIC, among others], as the case may be, by any court of competent jurisdiction, or by operation of law.

## APPLICABLE RULES OF STATUTORY CONSTRUCTION

A statute must be given its plain meaning according to its terms. *Caminetti v.*

*United States*, 242 U.S. 470, 485, 37 S.Ct. 192, 194, 61 L.Ed. 442 (1917). "[E]ach part of section [of a statute] should be construed in connection with every other part or section so as to produce a harmonious whole. Thus it is not proper to confine interpretation to the one section to be construed." 2A N. Singer, *Sutherland Statutory Construction* § 46.05 at 90 (rev. 4th Ed. 1984 & Supp. 1990).

## DISCUSSION

I must reconcile two arguably conflicting types of provisions in FIRREA, assuming the Conversion Agreement is a valid, enforceable contract. The potential conflict within FIRREA arises because of a possible conflict between two important goals: stringent, uniform regulation of an industry in shambles, and preserving preexisting rights and duties.

First, FIRREA clearly gives OTS broad, discretionary regulatory powers and requires the Director to impose *uniform* capital requirements on *all* thrifts. Second, FIRREA also says that existing rights, duties and obligations of the United States are not affected by the abolition of FHLBB, and shall continue against the United States, and the orders, resolutions, determinations and regulations of the FHLBB remain enforceable against its successor, OTS. Here, the potential clash arises because FHLBB agreed to capital requirements that do not comply with FIRREA.

Defendants' rely on four elements of FIRREA: first, the FIRREA language requiring uniformity and application of newly established capital requirements to all thrifts, second, an absence of statutory exceptions to those requirements for thrifts with prior forbearance agreements, third, the final provision of § 401(h) which says the prior orders, regulations or determinations remain in effect *until modified, terminated, set aside or superseded* by the

Director,[1] and finally, the broad discretionary regulatory power given the Director.

Defendants also urge me to join two other courts that have concluded that FIRREA abrogates prior agreements, *Flagship Federal Savings Bank v. Wall, Director*, No. 90–0079–GT (S.D.Cal. Feb. 14, 1990), and *El Paso Savings Association v. Director*, No. EP–89–CA–426–H (W.D.Tex. January 9, 1990).

Defendant acknowledges that Congress was aware of preexisting forbearances when it enacted FIRREA. They contend that Congress addressed those forbearances by giving the Director the discretion to grant exceptions from the FIRREA capital requirements until January 1, 1991, HOLA at § 5(t), and exemptions from certain sanctions for failing to meet the capital requirements, HOLA at § 5(t)(7).

In contrast, plaintiffs rely on the plain language of the Conversion Agreement and the § 401(h) and (g) FIRREA provisions preserving the existing duties and obligations of FHLBB, and continuing its orders, resolutions and determinations as enforceable against OTS.

Plaintiff also cites various FIRREA provisions related to powers of the Resolution Trust Corporation, created under § 501(b) to step in as conservator or receiver in place of FSLIC. FIRREA directs the Resolution Trust Corporation to review prior cases dating from January, 1988 until the enactment of FIRREA, including existing forbearances. § 501(b)(11)(B). Plaintiff notes that § 501 does not extend the Resolution Trust Corporation's authority to *terminate* these agreements beyond the FHLBB or FSLIC's prior authority. Plaintiff also points to the defeat of an amendment which would have extended the Resolution Trust Corporation's authority to terminate.

I have carefully considered the analysis

---

**1.** I do not rely on § 401(h). First, assuming the Conversion Agreement is a contract, it clearly creates rights, duties and obligations, and therefore falls under § 401(g). Second, if § 401(h) protects prior "determinations" and the Conver-

sion Agreement is a "determination", the protections it gives with one hand it takes away with the other. OTS has virtually unfettered discretion under § 401(h) to modify or terminate prior "determinations."

in *Flagship*.[2] There, the plaintiff thrift had a November, 1988 letter granting it a capital forbearance. The forbearance letter contained an escape clause providing that FHLBB "retain[s] the authority to rescind all or any of a portion of this forbearance if [it] determines that the resulting practice(s) is unsafe or unsound or otherwise actually or potentially detrimental to New Flagship."

In *Flagship*, the court disagreed that FIRREA directs OTS to honor its forbearance letter, for two reasons. First, § 401(g) says that the *abolition of the FHLBB* shall not affect the validity of rights, duties or obligations of the United States. The court found that the alleged obligation was not abrogated *because* the FHLBB was abolished, but instead because OTS acted pursuant to its mandate under FIRREA. Second, the court relied on the language of FIRREA applying to all savings associations, without exception for those with forbearances, but with other exceptions. Therefore, Congress demonstrated its intent not to exempt the thrifts with forbearances by exempting others.

*Flagship* is distinguishable. In *Flagship*, Judge Thompson specifically found that the forbearance letter was not a contract, because the escape clause made any "agreement" illusory. Nothing in the *Flagship* opinion suggests that the plaintiff had the type of comprehensive agreement, with private parties investing in reliance on the agreement, as Far West. I seriously doubt whether § 401(g) would apply in *Flagship*, because I doubt that the forbearance letter could even be loosely characterized as an existing right, duty or obligation under § 401(g).

Further, in this case, I cannot apply the *Flagship* conclusion that the cause of the abrogation was not the abolition of the FHLBB but rather the actions of the OTS. In *Flagship*, that may have been correct because the escape clause in the forbearance letter permitted FHLBB to back out of the "agreement" at its own discretion.

The Conversion Agreement here is significantly different. It has no escape clause to permit FHLBB to change its mind. By its own terms, it binds successors to all parties, and has many of the usual indications of an intent to be bound. Part of the arrangement involves private third parties investing $27 million into Far West. If FHLBB continued to exist, the Conversion Agreement would be enforceable against it. It is too much of a stretch in logic to conclude that the Conversion Agreement was not abrogated because FHLBB was abolished, but because of OTS's actions.

Finally, I am not persuaded that because FIRREA applies uniformly to all thrifts that it must apply to even those thrifts with contractual forbearances. I read the various sections of FIRREA to harmonize them, not to create a conflict. If FIRREA abrogates all existing contracts that bound the United States before its enactment, section 401(g) would be surplusage, utterly without purpose. Finally, I cannot conclude that FIRREA imposes such absolute requirements of uniformity among all thrifts as defendants argue, since it gives the Director discretion to make exceptions.

I have also examined the opinion in *El Paso*. There, on a motion for preliminary injunction, the court examined the legislative history of FIRREA to evaluate plaintiff's probability of success on the merits. The court relied on the failure of a proposed amendment which would have "grandfathered" thrifts with forbearance contracts. The court denied injunctive relief, in part because the plaintiff could not show that OTS wrongly applied FIRREA to "its particular case." The opinion does not describe the type of agreement at issue.

I am not persuaded by the opinion in *El Paso*. The court clearly left open the possibility that in another, the outcome could be different. Second, as I said above, I read FIRREA to harmonize the potentially conflicting sections. Congress's intent for uniformity could not have been so absolute

---

2. I agree with Judge Thompson that the § 501 provisions related to the authority of the Resolu-

tion Trust Corporation are irrelevant, because § 501 does not apply to Far West.

as defendants argue, when Congress left OTS room for exceptions.

Finally, Congress could not have intended a result so unjust and inequitable as the complete abrogation of a long-term, comprehensive agreement on which private third parties relied to invest large sums of money. To abrogate such an agreement would practically guarantee that potential investors will look elsewhere.

In summary, assuming that the Conversion Agreement is a valid enforceable contract, FIRREA does not abrogate that contract.

## CONCLUSION

Plaintiffs have shown irreparable harm and a likelihood of success on the merits. I grant plaintiff's motion for a temporary restraining order, effective at 12:30 P.M. on Friday, May 4, 1990. Plaintiffs will file an undertaking of $25,000 and submit a form of temporary restraining order. A hearing for preliminary injunction is scheduled for Monday, May 14, 1990 at 1:30 P.M.