**FAR WEST FEDERAL BANK, S.B.,
et al., Plaintiffs,**

v.

**DIRECTOR, OFFICE OF THRIFT
SUPERVISION, et al.,
Defendants.**

**Civ. No. 90–103–PA.**

United States District Court,
D. Oregon.

Sept. 14, 1990.

Brook Hedge, Theodore C. Hirt, Jeffrey S. Gutman, Gary W. Herschman, Dept. of Justice, Civ.Div., Washington, D.C., for defendant FDIC.

Eugene M. Katz, Acting Chief Counsel, Thomas J. Segal, Associate Chief Counsel, Aaron B. Kahn, Sr. Trial Atty., Elizabeth R. Moore, Sr. Trial Atty., Office of the Chief Counsel, Office of Thrift Supervision, Washington, D.C., for defendant Director, Office of Thrift Supervision.

Barnes H. Ellis, Christine Kitchel, Stoel, Rives, Boley, Jones & Grey, Portland, Or., Wesley G. Howell, Jr., John C. Millian, Gibson, Dunn & Crutcher, Washington, D.C., for plaintiffs.

Stuart M. Gerson, Asst. Atty. Gen., Leslie H. Southwick, Deputy Asst. Atty. Gen., Charles H. Turner, U.S. Atty., Herbert C. Sundby, Asst. U.S. Atty.

## OPINION

PANNER, Chief Judge.

Plaintiffs, Far West Federal Bank (Far West) and a number of its investors and stockholders (Investors), bring this action against the Director of the Office of Thrift Supervision (OTS), the Federal Home Loan Bank Board (FHLBB), the Federal Home Loan Bank of Seattle (FHLB–Seattle), the Federal Deposit Insurance Corporation (FDIC), and the Federal Savings and Loan Insurance Corporation (FSLIC).[1] The dispute concerns the enforceability of a 1987 agreement (Conversion Agreement) between Far West, the Investors, and predecessor agencies to OTS, after enactment of the Financial Institutions Reform, Recovery, and Enforcement Act of 1989 (FIRREA), Pub.L. No. 101–73, 103 Stat. 183 (codified in scattered sections of 12 U.S.C. (1989)).

---

1. Defendant OTS is the lead defendant. Defendant FHLB–Seattle, with respect to injunctive and declaratory relief on Count I and II issues, announced its alignment with plaintiffs. For convenience, unless otherwise necessary, I refer to defendants collectively.

I conducted a court trial on Counts I and II of plaintiffs' second amended supplemental complaint on August 14, 1990. These are my findings of fact and conclusions of law as required under Fed.R.Civ.P. 52(a). I find for plaintiffs on both Count I and II, and order entry of final judgment on those counts under Rule 54(b).

## PROCEDURAL HISTORY

This action commenced on January 29, 1990. On May 2, 1990, plaintiffs moved for a preliminary injunction and temporary restraining order (TRO). I granted plaintiffs' motion for a TRO from the bench, with an opinion filed on May 4, 1990.

The preliminary injunction hearing took place on June 4, 1990. Plaintiffs sought an order prohibiting OTS from: (1) enforcing regulatory restrictions inconsistent with the Conversion Agreement; and (2) enforcing FIRREA-based restrictions imposed by an April 24, 1990 letter from OTS to Far West. After the TRO issued, Far West amended its motion for preliminary injunction, seeking two additional orders: (3) prohibiting OTS from calculating Far West's Loan-to-One Borrower (LTOB) limit based on FIRREA standards; and (4) prohibiting OTS from publicly identifying Far West as targeted for takeover by the Resolution Trust Corporation (RTC), a federal agency.

In an opinion filed June 8, 1990, I granted plaintiffs' amended motion for preliminary injunction in part, and prohibited OTS from imposing on Far West FIRREA-based restrictions inconsistent with the Conversion Agreement. I denied plaintiffs' motion to enjoin OTS from publicly identifying Far West as targeted for takeover. I also denied plaintiffs' motion to prohibit OTS from using FIRREA-based calculations of Far West's LTOB limit.

On July 3, 1990, plaintiffs moved for leave to file an amended supplemental complaint, to delete one claim and add Count III (the "Schedule P" issue). I granted that motion and permitted counsel to brief whether Count III should be tried with the remaining counts on the scheduled trial date, August 14, 1990. Defendants promptly filed a "Motion to Dismiss Count III, or Postpone Trial on Count III, to Sever and Transfer Counts IV and V to the Court of Claims, or to Take Trial of Counts I and II off Calendar." On July 23, I denied all motions to dismiss, denied the motion to sever and transfer Counts IV and V, and denied defendants' motion to stay the action pending appeal of my ruling on severance and transfer. An opinion followed on August 8, 1990. 744 F.Supp. 233.

At that stage, there were five counts: 1) Count I: claim for declaratory and injunctive relief establishing that FIRREA did not abrogate the Conversion Agreement; 2) Count II: a takings claim for declaratory and injunctive relief on the same grounds; 3) Count III: the Schedule P claim, for declaratory relief establishing that the Conversion Agreement is enforceable because Far West has complied with it; 4) Count IV: a rescission and restitution claim brought by the Investors for failure of consideration under the Conversion Agreement; and 5) Count V: a due process claim for repudiation of the Conversion Agreement.

At a conference on August 10, 1990, counsel informed me that defendants had filed a motion in the United States Court of Appeals for the Federal Circuit to stay the trial pending appeal of my denial of their motion to sever and transfer Counts IV and V to the Claims Court. At that conference, plaintiffs conceded to severance of Count V and moved for voluntary dismissal of Count III. Defendants had no objection, and I severed Count V and granted the motion for voluntary dismissal of Count III. Defendants renewed their motion for a stay of Count IV. I denied that motion.

The day before trial, the Federal Circuit stayed the trial of Count IV. *Far West Federal Bank v. Director, Office of Thrift Supervision,* No. 90–1465 (Fed.Cir. Aug. 13, 1990). At trial on Counts I and II, counsel agreed that given the posture of the case, there was no issue of damages and the only remedy available, should plaintiffs prevail, is injunctive and declaratory. Counsel agreed that the final disposition of Counts I and II was primarily a

matter of law, given no material factual disputes.

## FACTS

### I. The 1987 Conversion Agreement

Far West is a federally chartered thrift. OTS was created by FIRREA as the federal agency given primary regulatory authority over thrifts. Before FIRREA, most of OTS's regulatory functions were performed by FHLBB. FSLIC, an arm of FHLBB, was the deposit insurer. FDIC now insures Far West's deposits. FHLB–Seattle is one of twelve federal home loan banks.

In the early to mid–1980's, Far West experienced severe financial difficulties. FHLBB and Far West began to investigate various ways to keep Far West afloat and avoid a financial disaster for Far West and its deposit insurer, FSLIC.

In 1986, a search began for sources of private funds to recapitalize Far West. In 1987, Far West and FHLBB identified a group of venture capitalists, now the Investors, as a possible source. Negotiations began on a deal under which the Investors would invest about $27 million into Far West, in exchange for a number of regulatory forbearances and loans to assist Far West in becoming profitable over a ten year period. Extensive negotiations between Far West, the Investors and the federal agencies culminated with the 1987 Conversion Agreement. Exhs. 10–14.

■■■ The Conversion Agreement is a set of related agreements among Far West, the Investors, FHLBB, and FHLB–Seattle.[2] It contains a number of provisions central to this action.

First, the Conversion Agreement converted Far West into a stock savings association, with the Investors as the stockholders. Second, Far West received a forbearance from enforcement of the standard regulatory capital and operating requirements in effect.

Third, the Conversion Agreement established a ten-year business plan and Modified Capital Requirements for Far West, stated in Schedule P of the Conversion Agreement. Far West would be deemed in compliance with regulatory capital requirements *"for all purposes* under the Insurance Regulations [then in effect] if Far West is in compliance with its Modified Capital Requirement." Exh. 10 at 3 (emphasis supplied). Schedule P provides that "the components of 'regulatory capital' will be as defined [under then-effective Insurance Regulations] ..., *notwithstanding any subsequent changes in the definition of regulatory capital* ... [with exceptions not pertinent here]." Exh. 10 at A–6 (emphasis supplied).

Fourth, FHLB–Seattle agreed to provide Far West a "credit facility", which is $1.5 billion in loans and guarantees. Exh. 14. The Credit Facility Loan Agreement permits Far West to invest the credit facility in "acceptable assets", defined as:

> good quality (i) loans secured by mortgages or deeds of trust covering securities; (ii) consumer loans; (iii) mortgage-backed stocks; (iv) corporate debt securities; (v) preferred stocks; (vi) securities issued or guaranteed by the United States or any agency thereof; (vii) derivatives of mortgage-backed securities; (viii) cash or cash equivalents; (ix) securities backed by permanent commercial real estate mortgages; and (x) state and municipal securities.

Exh. 14 at 1.

Fifth, the Conversion Agreement contains a number of provisions to enable Far

---

**2.** Early in this action, OTS suggested that there would be a dispute over whether the Conversion Agreement is a "contract", or merely a "regulatory forbearance." This was relevant in determining whether FIRREA abrogated the Conversion Agreement. Because that question may have presented complex issues requiring development of facts, for purposes of preliminary relief, I instructed the parties to assume that the Conversion Agreement is a contract.

Since then, OTS has not seriously argued that the Conversion Agreement is not a contract. However, it consistently refers to the Conversion Agreement as a "regulatory forbearance", without distinguishing it from other agreements that are not so clearly contractual. I have examined the Conversion Agreement carefully. There is no doubt that it is a contract, of which a regulatory forbearance is one element of consideration.

West to use the credit facility. Far West could amortize the credit facility on a twenty-five year, straight line schedule. FHLB–Seattle waived liability growth limitations on Far West. The credit facility was defined as an intangible asset, to be included in Far West's regulatory capital.

## II. FIRREA

The conditions leading to the passage of FIRREA are well-known. Mismanagement, fraud, incompetence, and permissive regulation led to a massive number of thrift failures throughout the country, and threatened to bankrupt FSLIC deposit insurance funds. FIRREA was a sweeping attempt to bring the "S & L crisis" under control, recapitalize deposit insurance funds, and tighten regulatory control over the thrift industry.

Despite the complexity and breadth of FIRREA, one provision is central to this action, § 401(g), which provides in pertinent part:

> SAVINGS PROVISIONS RELATING TO FHLBB.—
> (1) EXISTING RIGHTS, DUTIES AND OBLIGATIONS NOT AFFECTED.—Subsection (a) [abolishing FSLIC and FHLBB] shall not affect the validity of any right, duty or obligation of the United States, the ... [FHLBB], or any other person, which—
>> (A) arises under or pursuant to the Federal Home Loan Bank Act, the Home Owner's Loan Act of 1933, or any other provision of law applicable with respect to such Board ...; and
>> (B) existed on or before the date of the enactment of ... [FIRREA].

FIRREA, Pub.L. No. 101–73, § 401(g), 103 Stat. at 356 (codified at 12 U.S.C. § 1437 note).

## III. OTS Actions after Enactment of FIRREA

### A. *Determination that Far West is Capital Deficient*

In December, 1989, after promulgating its regulations, OTS determined that Far West did not comply with the new capital requirements established in § 301 of FIRREA. Pursuant to its regulatory authority, OTS directed Far West either to show compliance with FIRREA or submit a plan to achieve compliance by December 1994. In response, Far West submitted the 10-year plan established in the Conversion Agreement.

On April 24, 1990, OTS notified Far West that it disapproved the Conversion Agreement plan, in part because the plan relied on substantial government assistance. Exh. 32. OTS deemed Far West out of compliance with capital requirements and imposed more stringent capital requirements. It directed Far West's directors to execute a Consent Agreement permitting OTS to take virtually the same regulatory action permitted under FIRREA, including placing Far West into receivership or conservatorship. The TRO and preliminary injunctions issued in this action prohibited enforcement of the April 24, 1990 letter and the Consent Agreement.

### B. *Reducing the Loan–to–One Borrower (LTOB) Limit*

The LTOB limit caps the amount of credit a thrift can extend to a single borrower. Its purpose is to reduce the chances that financial problems of a single, large borrower will destroy the thrift.

The Conversion Agreement does not expressly refer to the LTOB. However, it provides that the credit facility is to be accounted for as an intangible asset. It also provides that intangible assets are to be included in the calculation of Far West's "regulatory capital" and defines regulatory capital "for all purposes". The pre-FIRREA LTOB limit was calculated as a percentage of regulatory capital.

Therefore, defining the credit facility as an intangible asset increased Far West's LTOB above what it would otherwise be. This permitted Far West to make larger, more profitable loans than it could with a lower LTOB limit. After the Conversion Agreement, Far West established "niche lending" businesses, primarily commercial lines of credit, real estate investments, and consumer credit cards. These are particu-

larly profitable loans, generally between $1–$5 million.

By amending the Home Owner's Loan Act of 1933 (HOLA), § 301 of FIRREA modified the calculation of the LTOB, to a percentage of "unimpaired capital and unimpaired surplus." Home Owner's Loan Act of 1933, § 5(u), 12 U.S.C. § 1464(u); 12 U.S.C. § 84. Intangible assets, such as the credit facility, are not included in "unimpaired capital and unimpaired surplus".

Beginning in December 1989, OTS notified Far West that its LTOB limit would be $500,000, without regard to the credit facility or Far West's regulatory capital. Exh. 20. This restriction severely hampered the "niche lending" businesses because the loan amounts generally exceed $500,000.

## C. Restrictions on the Use of the Credit Facility

Based on its determination that Far West is capital deficient under FIRREA, OTS imposed a number of restrictions on Far West which affect its use of the credit facility. Exhs. 32, 34. OTS directed Far West to cease purchasing and divest itself of high yield corporate bonds (commonly known as "junk bonds") in accordance with § 222 of FIRREA, 103 Stat. at 270, 12 U.S.C. § 1831e. See, Exh. 34. Second, OTS prohibited Far West from accepting, renewing, or rolling over brokered deposits[3], without an express waiver from FDIC. Exh. 24. Third, OTS restricted Far West's growth, contrary to the waiver in the Credit Facility Loan Agreement. Exhs. 15, 26. Fourth, OTS restricted the types of assets that Far West can use as collateral to secure the credit facility. Exhs. 14, 24, Tisdel Decl. in Support of Motion for Summary Judgment, at 12, lines 7–9.

**3.** Brokered deposits are large funds collected and deposited by intermediary retail entities.

**4.** Plaintiffs submitted several opinions from other districts. Though not all are factually on all fours, the courts are generally in accord with my analysis. See Franklin Fed. Sav. Bank v. Director, Office of Thrift Supervision, Civil No. 2–90–166, 1990 WL 123145 (E.D.Tenn. July 16, 1990); Sterling Sav. Ass'n v. Ryan, Civil No.

## DISCUSSION

Although this action presents sensitive and important public policy issues, it is not complex. As it now stands, it presents three questions: first, whether FIRREA abrogated the Conversion Agreement; second, if so, which provisions did it abrogate and what does the Conversion Agreement require; and third, whether defendants' repudiation of the Conversion Agreement is a "taking" within the meaning of the fifth amendment of the United States Constitution. Finality on these questions is important so that the other claims can be resolved and those who need to know the rules can proceed with some predictability.

It is important to note how extensive the parties' agreements are, because in light of their agreements and what I have already decided there is little left for me to decide now. First, there is no material factual dispute about the events leading to the Conversion Agreement or what happened since then. Second, plaintiffs do not dispute that Congress, if it wanted to, could have abrogated the Conversion Agreement. They merely contend that Congress did not, except for junk bond divestiture. Finally, the parties agree that Far West does not, and cannot now comply with FIRREA capital requirements.

I now address Counts I and II in turn.

## I. Count I—FIRREA Preserves Plaintiffs' Rights and Duties under the Conversion Agreement

■ In my prior opinions, I accepted plaintiffs' argument that FIRREA did not abrogate the Conversion Agreement, because the Conversion Agreement is a set of pre-existing rights and duties, preserved under § 401(g). After trial and additional briefing, I have not changed my mind.[4] I

90–0175–JLQ (E.D.Wash. Aug. 8, 1990); Security Fed. Sav. Bank of Florida v. Director, Office of Thrift Supervision, 747 F.Supp. 656 (N.D.Fla. 1990); Guaranty Fin. Serv., Inc. v. Director, Office of Thrift Supervision, 742 F.Supp. 1159 (M.D.Ga.1990). Of course, not every court agrees, see, e.g., First Fed. Sav. Bank & Trust v. Ryan, Civil No. 90–60171AA (E.D.Mich. July 19, 1990); c.f. Flagship Fed. Sav. Bank v. Wall, 748

do not repeat the reasons for this conclusion. Because plaintiffs now concede that FIRREA abrogates their contractual right to invest in junk bonds, I do not address that issue.

Plaintiffs are entitled to a permanent injunction and a declaratory judgment establishing that their rights and duties under the Conversion Agreement are not abrogated by FIRREA. I have reconsidered my prior ruling on the LTOB issue. Plaintiffs contend that disputes about interpretation of the Conversion Agreement have arisen since the preliminary injunction. Therefore, I specifically address the LTOB limit and other OTS actions based on OTS's determination the Far West is capital deficient under FIRREA.

### A. Far West's LTOB limit is to be Calculated under the Conversion Agreement

■ In my preliminary injunction opinion, I concluded that because the Conversion Agreement did not expressly address the LTOB calculation, FIRREA controlled on this issue. Having again studied the Conversion Agreement and received additional briefing, I now conclude otherwise.

Earlier, I found that because the Conversion Agreement did not expressly address the LTOB, it was unambiguous, FIRREA controlled, and no parol evidence should be used to interpret the LTOB calculation. I based this on the well-established contract principle that parol evidence is not admissible to alter or supplement the terms of a contract, but only to interpret ambiguous language. *Hotel Employees Health Trust v. Elks Lodge*, 827 F.2d 1324, 1327 (9th Cir.1987). Nor is parol evidence admissible to create ambiguity. *Operating Eng'r. Pension Trust v. Beck Eng'r. & Surveying Co.*, 746 F.2d 557, 566 (9th Cir.1984) (citations omitted). Because I viewed the LTOB dispute as based on a non-existent, rather than ambiguous provision of the Conversion Agreement, I did not consider parol evidence of the parties' intent about

the LTOB calculation. I did not view other language in the Conversion Agreement as related to the LTOB.

I now conclude that the Conversion Agreement language defining the Modified Capital requirements *"for all purposes"* and defining "regulatory capital", ... *"notwithstanding any subsequent changes in the definition of regulatory capital"* (emphasis supplied) could relate to the LTOB. The existence of ambiguity in a contract is a matter of law. *Port of Portland v. Water Quality Ins. Syndicate*, 796 F.2d 1188, 1194 (9th Cir.1986). I find this language ambiguous, so parol evidence may be used to interpret it.

I now find that this language could reasonably be interpreted as fixing the rules under which Far West would operate for the duration of the Conversion Agreement, including the LTOB calculation. It could be then viewed as an expression of the promise of continued, stable regulatory treatment as a critical part of the negotiated agreement. *Cf., Winstar Corp. v. United States*, 21 Cl.Ct. 112 (1990). Therefore, I deny defendants' objections to admission of parol evidence to interpret the language "for all purposes" and "notwithstanding any subsequent changes".

■ The key negotiators for all parties to the Conversion Agreement are unanimous about the intent of that language. They agree that "for all purposes" and "notwithstanding any subsequent changes" meant that the rules then in effect would not change, including the calculation of the LTOB. They also agree that fixing the LTOB calculation was critical to the purpose of the Conversion Agreement, because the profitable "niche lending" was essential and would have been prohibited without an enhanced LTOB. Tisdel Decl. para. 26–27 (for Far West); Nierenberg Decl. para. 20 (for Investors); McJoynt Decl. para. 37 (for federal agencies). Defendants have produced no evidence controverting these statements.

F.Supp. 742 (S.D.Cal.1990). The Circuits have yet to try their hands on the question. Final

resolution may be with the Supreme Court, Congress, or both.

Based on this evidence, I interpret the Conversion Agreement in accordance with the undisputed intentions of the parties. I conclude that the Conversion Agreement entitles Far West to calculate its LTOB based on regulatory capital as defined in the Conversion Agreement, in accordance with the methods in effect when the Conversion Agreement was executed, for the duration of the Conversion Agreement.

### B. Regulatory Actions based on a Determination that Far West is Capital Deficient under FIRREA are Improper

OTS has imposed a number of specific regulatory restrictions on Far West, all based on a determination that Far West is not in compliance with FIRREA capital requirements. Uncontroverted evidence shows these restrictions are inconsistent with the Conversion Agreement[5].

For the reasons set forth above, and based on my prior opinions, I conclude that OTS is prohibited from deeming Far West as non-compliant with its regulatory capital requirements, so long as Far West complies with the Modified Capital Requirements established in Schedule P of the Conversion Agreement, for the duration of the Conversion Agreement.[6] Any regulatory action under FIRREA authority, based on OTS's determination that Far West is not in compliance with FIRREA capital requirements, is improper.

**5.** Count III, voluntarily dismissed right before trial, arose after OTS deemed Far West in default of Schedule P of the Conversion Agreement. Far West disputed that determination and amended its complaint to include a claim for a declaratory judgment and injunctive relief establishing it was not in default.

Under the Conversion Agreement, if Far West fails to meet Schedule P capital requirements, all bets are off, and OTS can take virtually the same action it normally could take absent the Conversion Agreement, under FIRREA. Because that claim is not before me, I do not decide whether OTS can take the actions it has taken, under the authority of the Conversion Agreement. I decide only that it cannot take them under FIRREA.

**6.** Defendants dispute whether "the government" agreed that Far West may operate under the

### II. Count II—Defendants Actions are a Taking under the Fifth Amendment

In Count II, plaintiffs seek a declaration that defendants' repudiation of the Conversion Agreement is a taking of their property interests in the Conversion Agreement.

### A. Legal Standards

 The fifth amendment of the United States Constitution prohibits the government from impairing valid contracts in which there is a property right without just compensation. *Lynch v. United States*, 292 U.S. 571, 579, 54 S.Ct. 840, 843–44, 78 L.Ed. 1434 (1934). This applies to the government's own contracts. *Id.* Balanced against this is the principle that the government, in its sovereign power, may abrogate its contracts when necessary to protect vital public interests. *Home Bldg. & Loan Ass'n v. Blaisdell*, 290 U.S. 398, 434, 54 S.Ct. 231, 238–39, 78 L.Ed. 413 (1934). To establish a property interest in a governmental contract or benefit, a claimant must have more than a "unilateral expectation" or "abstract need", but must show a legitimate claim of entitlement. *Ruckelshaus v. Monsanto Co.*, 467 U.S. 986, 1005–06, 104 S.Ct. 2862, 2874–75, 81 L.Ed.2d 815 (1984); *Board of Regents v. Roth*, 408 U.S. 564, 577, 92 S.Ct. 2701, 2709, 33 L.Ed.2d 548 (1972).

 In determining whether the government has unconstitutionally impaired a contract, the court must decide whether the purported agreement, by con-

Schedule P Modified Capital Requirements for ten years. They object to extrinsic evidence about what agreement the "government" could make. *See,* McJoynt Decl. para. 22. Defendants contend that FHLBB's agreement was not sufficient to waive a subsequent exercise of sovereign power to abrogate the Conversion Agreement.

I agree with plaintiffs that this argument is a "red herring". Pl. Supp. Memo Regarding Admissibility of Parol Evidence, at 7, lines 6–17. It is not necessary to decide whether FHLBB's agreement to the Conversion Agreement was a waiver binding on Congress, because in § 401(g) of FIRREA, Congress preserved that agreement. Any evidence about what "the government", rather than FHLBB, agreed to do, is irrelevant.

tract, statute or regulation, is a contract, or merely an expression of the sovereign's policy. *See United States Trust Co. of N.Y. v. New Jersey,* 431 U.S. 1, 18, 97 S.Ct. 1505, 1515–16, 52 L.Ed.2d 92 (1977). The language and circumstances of the relevant agreement is the basis for this inquiry. *Id.* at 17 n. 14, 97 S.Ct. at 1515 n. 14 (citing cases). There are three factors that are important in distinguishing the taking of a property interest from governmental regulation: 1) the economic impact on the claimant; 2) the extent of interference with distinct, investment-backed expectations; and 3) the character of the governmental action. *Ruckelshaus v. Monsanto,* 467 U.S. at 1005, 104 S.Ct. at 2874; *Penn Cent. Transp. Co. v. New York City,* 438 U.S. 104, 124, 98 S.Ct. 2646, 2659, 57 L.Ed.2d 631 (1978).

### B. *Application of Legal Standards*

Defendants challenge the taking claim on two grounds: there is no protected property interest in the Conversion Agreement, and the Conversion Agreement is not a protected contract. I disagree with both.

1. Plaintiffs have a Property Interest in the Conversion Agreement

■ Defendants contend that plaintiffs' interests in the Conversion Agreement do not rise to the level of a constitutionally protected property interest, because the Conversion Agreement was merely the statement of regulatory policy, not intended to create binding, contractual rights. They insist that because of the scope of regulation of the thrift industry, plaintiffs were on notice that the policy could change.

Plaintiffs' property interest in the Conversion Agreement is clear. They have far more than a mere unilateral expectation in the Conversion Agreement. They have a valid, binding contract, in reliance on which the Investors risked $27 million.

2. The Conversion Agreement is a Binding Contract, not merely an Expression of Regulatory Policy

■ Defendants argue that the Conversion Agreement is only an expression of regulatory policy. They rely principally on *Bowen v. Public Agencies Opposed to So-*

*cial Security,* 477 U.S. 41, 106 S.Ct. 2390, 91 L.Ed.2d 35 (1986) (*POSSE*). There, the Supreme Court found no congressional intent to create a binding contract when Congress had inserted into legislation a clause expressly reserving its right to alter, amend or repeal any provision of the legislation, and the challenged provision lacked other indicia of intent to be bound. 477 U.S. at 51–2, 106 S.Ct. at 2396–7; *see also Educ. Assistance Corp. v. Cavazos,* 902 F.2d 617, 628 (8th Cir.1990); *Ohio Student Loan Comm'n v. Cavazos,* 900 F.2d 894, 901–02 (6th Cir.1990); *South Carolina State Educ. Assistance Auth. v. Cavazos,* 897 F.2d 1272, 1275–76 (4th Cir.1990). Defendants read *POSSE* for the principle that the government always has the sovereign power to amend a regulatory scheme. They note that the express reservation of the right to alter or amend, on which the *POSSE* Court relied, is not necessary, because waiver of sovereign power must be unmistakable. *See POSSE,* at 477 U.S. at 52, 106 S.Ct. at 2396–97.

It is clear that the Conversion Agreement is far more than an expression of regulatory policy, under the standards set forth in *Penn Central.* The economic impact on plaintiffs of repudiation of the Conversion Agreement is severe. The Investors relied on promises that regulatory forbearances would continue for ten years. To invest $27 million into a business with a $300 million deficit, absent any such assurance would have been economic suicide. Repudiation has the same ultimate effect.

Second, plaintiffs have a distinct, investment-backed expectation that the Conversion Agreement would remain in effect for its stated duration. The Investors invested and Far West commenced its niche-lending business, as well as other steps in reliance on the Conversion Agreement. It is hard to imagine any more distinct an investment-backed expectation could be.

Finally, the nature of the governmental action is clear and unmistakable on the face of the Conversion Agreement. As I have already noted, it states an intent to be contractually bound, mutual promises and consideration. Paragraph I states the "[i]n

consideration of the mutual promises contained herein, the parties enter into the following agreement." Exh. 10 at 2. The provision establishing termination of the Conversion Agreement sets out three methods of termination. None includes a change of heart.

The government parties bargained for something of great value to them, avoidance of Far West's failure when the deposit insurance funds were stretched to the breaking point. The private parties got something of value as well, the ability to rely on relaxed regulatory standards and access to cash, so they could make money.

The only language in the Conversion Agreement that could remotely be construed as a reservation of the right to alter or amend, either express or implied, is in Paragraphs XII and XIII. Paragraph XII provides that the rights given by the Agreement are in addition to rights given by other law, and that any forbearances, failure, or delay in exercising rights is not a waiver. Exh. 10 at 9. Paragraph XIII states that the Conversion agreement is governed by federal law, and does not require unlawful action by any party. *Id.* This language is certainly not the unmistakable reservation of the authority to modify, as in *POSSE.* It is not even an implied reservation of that authority. Contrary to defendant's argument, I find nothing in the Conversion Agreement that could be construed as notice to plaintiffs that the deal could be called off if the government embarked on the path of a different regulatory scheme.

While I do not decide whether the government made a good deal when it entered the Conversion Agreement, I do find that it intended to, and did enter a valid, binding contractual relationship with plaintiffs. Plaintiffs have a property interest in that contract. Therefore, I conclude that repudiation of the Conversion Agreement is a taking within the meaning of the fifth amendment.

## CONCLUSION

Plaintiffs are entitled to declaratory relief and permanent injunctive relief on Counts I and II of the Second Amended Supplemental Complaint, in accordance with the accompanying declaratory judgment and injunction.