**RESOLUTION TRUST CORPORATION, in its Capacity as Conservator for Bexar Savings Association, San Antonio, Texas**

v.

**TETCO, INC.**

**No. SA–89–CA–847.**

United States District Court,
W.D. Texas,
San Antonio Division.

Dec. 5, 1990.

Johnathan Taylor, Resolution Trust Corp., Washington, D.C., Robert D. Daniel, H. Fred Cook, Hirsch & Westheimer, Houston, Tex., for Resolution Trust Corp.

R. Laurence Macon, Paul D. Andrews, Stephen M. Marceau, Cox & Smith, Adrian A. Spears, San Antonio, Tex., Robert B. Ott, Howard N. Cayne, Pauline B. Heller, Arnold & Porter, Washington, D.C., for Tetco, Inc.

## ORDER ON MOTIONS FOR SUMMARY JUDGMENT

BUNTON, Chief Judge.

BEFORE THIS COURT are the Motions of the Plaintiff, Resolution Trust Corporation ("RTC"), and the Defendant, Tetco, Inc. ("Tetco"), for Summary Judgment in the above-captioned cause, along with corresponding Responses in opposition to the Motions, and supplemental Briefs filed by both parties. The parties' rival Motions and supporting documents depict mirror images of essentially the same legal and factual issues. Counsel for both parties skillfully argued their Motions before the Court. Upon consideration of the Motions, Responses, and supporting Briefs, this Court is of the opinion Defendant Tetco's Motion for Summary Judgment should be granted and Plaintiff Resolution Trust Corporation's Motion for Summary Judgment should be denied.

This Court finds central to the disposition of both Motions the question of whether there exists any genuine issue of material fact as to essential elements of Plaintiff's contract claim, and the legal issue of Plaintiff's standing under the private right of action doctrine. Finding these matters dispositive, the Court does not address the remaining grounds raised in the Motions. The Court here sets forth its reasons for granting the Defendant's Motion.

*Standard on Motion for Summary Judgment*

Rule 56(e), Federal Rules of Civil Procedure, provides that, when a properly supported motion for summary judgment is made, the adverse party is required to "set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby*, 477 U.S. 242, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986). Summary judgment will be granted unless there is a dispute about a material fact, and the dispute is genuine. A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* at 106 S.Ct. 2510–11. Therefore, a motion for summary judgment shifts to the nonmoving party the burden to "make a showing sufficient to establish the existence of [each] element essential to that party's case, and on which that party will bear the burden of proof at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986). If the nonmoving party fails to meet its burden, there can be no genuine issue of any material fact because a failure of proof regarding an essential element of the nonmoving party's case renders all other facts immaterial. *Id.* If the nonmoving party's evidence is not significantly probative, summary judgment may be granted. *Anderson*, 106 S.Ct. at 2511.

*Factual Background*

Bexar Savings Association ("Bexar") was organized in 1966 as a Texas savings and loan association. Bexar did not apply, nor was it required to apply for Federal insurance of its deposit accounts at that time. Through a series of stock transactions, Defendant Tetco, a Texas corporation, acquired a controlling interest in Bexar savings in 1983. Because Bexar's deposits were not then Federally insured, Tetco was not required to register with the Federal Home Loan Bank Board (FHLBB) as a savings and loan holding company at the time it acquired control of Bexar. By 1985, Tetco proceeded to acquire all of the outstanding shares of Bexar.

Bexar applied to the Federal Savings and Loan Insurance Corporation (FSLIC) in 1986 for insurance of its deposit accounts. The FHLBB, as administrative head of the FSLIC, through its Dallas supervisory agent Roy Green ("Green"), requested Tetco to apply to register as a savings and loan holding company. Though its officers apparently did not believe this application necessary to obtain Federal deposit insurance for Bexar, Tetco nevertheless filed the required application form ("Form H–(e)1") on or about March 14, 1986. On October 29, 1986, the FHLBB issued its Resolution approving Bexar's application for deposit insurance, subject to compliance with certain terms. One of those terms concerned Tetco's promise to cause Bexar's net worth to be maintained at minimum regulatory levels, and to infuse equity capital as necessary to comply with this net worth maintenance requirement.

By letter dated November 26, 1986 ("the Green letter"), Green approved Tetco's application to register as a holding company. Green also advised Tetco that Tetco would have to stipulate Bexar's net worth would be maintained at the required regulatory minimum level for as long as Tetco controlled Bexar. However, the Green letter failed to mention any capital infusion requirement. In response to the Green letter, Dayton Simms ("Simms") in his capacity as Chief Financial Officer of Tetco wrote a letter ("the Simms letter") dated December 24, 1986. Simms' letter affirmed that Tetco would cause Bexar's net worth to be maintained at the required level as set forth in the Green letter for so long as Tetco controlled Bexar.

Bexar subsequently experienced severe losses and, on March 2, 1989, was declared insolvent by the FSLIC. FSLIC then took over as Bexar's conservator and operated Bexar at all pertinent times thereafter. The Resolution Trust Corporation ("RTC") as successor to the FSLIC subsequently filed this lawsuit seeking damages in contract from Tetco for breach of the net worth maintenance agreement. Tetco filed a Motion to Dismiss, which this Court denied, and the parties then filed these cross Motions for Summary Judgment.

*Contract Formation*

RTC claims essentially that Tetco, in the Simms letter, promised to maintain Bexar's net worth in exchange for the FHLBB's approval of Tetco's application to register as a savings and loan holding company. Tetco argues it lawfully controlled Bexar before submitting the application. This being true, Tetco was entitled as a matter of law to register as a holding company and retain control of Bexar and FHLBB had no discretion in the matter. Consequently FHLBB was legally obligated to grant the application and therefore granting the application could not constitute consideration for Tetco's alleged promise set forth in the Simms letter.

The RTC further contends the FSLIC's granting of deposit insurance also was consideration for the net worth affirmation contained in the Simms letter. Tetco responds that it made no commitment concerning Bexar's net worth in the deposit insurance application itself. Nevertheless, the deposit insurance was granted, albeit subject to the condition that Tetco agree to maintain Bexar's net worth at the minimum regulatory levels. Tetco argues this sequence of events, and the tenor of the language setting forth the conditions and stipulations regarding maintenance of Bexar's net worth, indicate the net worth maintenance agreement was "merely part of the process" of applying for deposit insurance (and for registration as a holding company).

In *In re Conner Corporation*, No. 87–01697–MO4, 1990 WL 124052 (Bankr.E.D.N.C., June 20, 1990), under very similar facts, the Bankruptcy Court held that the FHLBB's regulatory approval of a prospective holding company application was not consideration for the holding company's promise to maintain a savings and loan association's net worth. The Court stated in that opinion, "[the holding company] was simply complying with the regulatory requirements of [the FHLBB] in the process of applying for insurance on the customer deposits ... [t]he promise to perform a legal duty imposed by law is insufficient consideration to support a contract." Alternatively, the Court found the net worth maintenance stipulation represented a regulatory condition imposed on the prospective holding company and did not arise out of the sort of "offer and acceptance" that would give rise to a contract between the Board and the holding company.

Similarly, in *RTC v. Savers, Inc.*, No. LR–C–89–529 (E.D.Ark., June 12, 1990), the District Court found a holding company's net worth maintenance commitment was not enforceable as a private contract. The *Savers* Court reasoned that, because the holding company was required by law to comply with the net worth maintenance regulation, its commitment to abide by the regulation was not "bargained for" consideration which would support a contract.

This Court does not necessarily agree as a general principle with the *Conner* and *Savers* analysis of consideration. The Court assumes Tetco was indeed required to register as a holding company, and further assumes the FHLBB had broad discretion in imposing conditions upon Tetco's application to so register (*See, e.g., Kaneb Services v. FSLIC*, 650 F.2d 78, 82–83 (1981) (finding clear Congressional intent to give the FSLIC authority to impose conditions upon approval of a holding company's acquisition of a savings and loan)). It is conceivable FHLBB's actions under some circumstances could amount to consideration supporting a prospective holding company's promise to fulfill certain regulatory conditions including a net worth maintenance stipulation. However, this Court agrees with *Conner* to the extent careful scrutiny should be given as to whether such stipulations constitute contracts.

In the case at bar, this Court finds persuasive Tetco's argument the net worth condition in the Resolution granting deposit insurance was a statement setting forth a regulatory condition. The net worth stipulation in the Simms letter was merely an acknowledgement and statement of assent to be bound by an *order* of the pertinent regulatory authorities. The terms of the net worth agreement and the regulatory approvals were never the subject of negotiations between the parties; their scope and

effect were preordained to the letter by the regulations. The Court believes there is no genuine issue of material fact that the parties' intent was to fulfill the prerequisites of a regulatory blueprint. It was not to create independent contractual obligations. Alternatively, the Court finds that it was never Tetco's intent in executing the Simms letter to have conduct Tetco regarded as compliance with a regulatory process create a contractual obligation. Therefore no "meeting of the minds" occurred with respect to the essential nature of the transaction, and consequently no contract ensued.

■ The Court does not regard this transaction as analogous to a suit on a note. As a prospective institutional borrower, Tetco from the outset theoretically could have negotiated freely with a prospective lender over the amount of the note, the term, the rate of interest, the nature of collateral and the type of interest therein to be conveyed, and a host of other rights and obligations. As an applicant to register as a savings and loan holding company, Tetco had to obey the law and the regulations imposed on it. It appears to the Court there was no bargaining over terms or, as Defendant explains, no "offer and acceptance," none of the sort of interactions that one expects to see when parties are making up their minds about what they mean to exchange. Tetco's application was more in the nature of an application for a license, to practice law, for example, and the Simms letter simply a stipulation of Tetco's understanding of, willingness to perform what the law required.

The RTC cites the Court to two recent cases treating a conversion agreement and a capital forbearance agreement as contracts. In *Far West Federal Bank, S.B. v. Director, Office of Thrift Supervision,* 746 F.Supp. 1042 (D.Or.1990) the FHLBB had aggressively solicited private funds for recapitalization of an ailing institution. It found a group of venture capitalists and engaged with them in extensive negotiations leading up to a Conversion Agreement which contained numerous negotiated provisions including a forbearance from en-

forcement of the standard regulatory capital requirements. The District Court in that case found the Conversion Agreement to be a contract creating rights and duties protected by the FIRREA savings clause, 12 U.S.C. section 1437(g).

Similarly, in *Winstar Corporation & United States Federal Savings Bank v. United States,* 21 Cl.Ct. 112 (1990), the FHLBB actively sought bids for the acquisition of an ailing institution and undertook negotiations with Winstar, the prospective holding company. Among the negotiated items were the accounting method to be used in the acquisition, and the related issue of the institution's liberty to treat its deficit as "goodwill," i.e. as a depreciable book asset. The Claims Court, in determining whether the acquisition transaction culminated in a contract, analyzed what evidently comprised extensive internal memoranda and correspondence between the parties. The Court analyzed those communications in terms of offer and acceptance, and mutuality of intent. The Court found the accounting agreement to be a contract rather than expression of regulatory policy. In so finding, the Court considered critical the likelihood that, without the accounting term, no purchaser would have engaged in the transaction.

■ The case at bar, in contrast to the cases cited by the RTC, does not appear to involve "the type of comprehensive agreement" that could, independent of the regulations, be said to create existing rights and obligations within the meaning of FIRREA or contract. *See Far West Federal Bank, S.B. v. Director, Office of Thrift Supervision,* 738 F.Supp. 1559 (D.Or.1990), *citing Flagship Federal Savings Bank v. Wall, Director,* 748 F.Supp. 742 (S.D.Cal. 1990); *El Paso Savings Association v. Director,* No. EP–89–CA–426H (W.D.Tex. Jan. 9, 1990).

Certainly, regulatory forbearance agreements such as those involved in the cases cited by RTC stand to curtail the agencies' latitude in regulating institutions and holding companies. However, the forbearance agreements in those cases were pre-FIRREA agreements, and Congress' intent in

enacting FIRREA undoubtedly included tightening down the regulatory mechanism to render it more uniform and consistent. At the same time, the inclusion of a savings clause in FIRREA meant Congress never intended to abrogate virtually all agreements for the sake of administrative control, perhaps, as Tetco argues, to balance the need for such control against the need to foster investment in the industry.

The problem the Court sees with these cases RTC cites is that promises to forebear from enforcing regulatory capital requirements involve substantial deviation from the regulations and potentially compromise the overriding policy of guaranteeing that holding companies will be a source of strength for their insured subsidiaries. Apprehensive investors contemplating an ailing thrift undoubtedly place equally substantial reliance on the promise that the government will not cannibalize their other capital if and when the thrift suffers a fatal relapse.

It is difficult to envision reliance supporting a contract or implied contract theory where the government does not materially change its position but rather merely holds the prospective investor or prospective registrant to existing regulatory net worth requirements. Where, as here, the investor is the party whose promise is the subject of the litigation, the argument from RTC's cases seems even more tenuous.

In this Court's view, in sum, there is no genuine issue of material fact the net worth maintenance stipulations included in the Resolution and in the Green letter were in the nature of administrative orders with which the law required Tetco to comply, and not the conditions of any contract. The recitation in the Simms letter was a stipulation of Tetco's intent to comply with those orders. Agreeing in principle with *Conner*, this Court as a matter of law finds no contract was formed.

*Private Right of Action*

Tetco, assuming the net worth stipulation here sued upon to be a regulatory condition and not a contract, argues that there is no private right of action to enforce a regulatory condition under the Sav-

ings and Loan Holding Company Act or the Change in Control Act. Tetco argues, therefore, the RTC lacks standing to assert this private contract suit. Tetco cites authorities saying Congress intended the FHLBB and the OTS to have sole authority to enforce regulatory conditions. Consequently the RTC's action in seeking remedies apart from those intended by Congress is a thinly-disguised attempt to surmount Bexar Savings' lack of standing to enforce a regulatory condition.

In response, the RTC contends its claim is simply a contract claim to enforce the terms of an agreement whose essential terms are set out in the Simms letter. The Complaint on its face does not allege the violation of any statute or regulation, and therefore this is not a suit to enforce any statute or regulation. Consequently, the case presents no private right of action issue whatsoever.

The RTC cited no legislative history or interpretive case law suggesting that Congress intended to create anything but an administrative remedy for failure of a holding company to comply with a regulatory net worth maintenance condition. Favoring Tetco's position that no such private right of action exists, the Eighth Circuit found no private right of action in favor of the FSLIC in its capacity as conservator of a failed thrift against the thrift's former directors. *FSLIC v. Capozzi*, 855 F.2d 1319 (8th Cir.1988). In *Capozzi*, the FSLIC sought damages for violation of various Federal savings and loan regulations authorized under the Federal Home Owners Loan Act, 12 U.S.C. section 1461 et seq. *FSLIC v. Capozzi*, 653 F.Supp. 591, 598–600 (E.D.Mo.1987). The Eighth Circuit determined no express or implied private action existed under that Act, which authorizes regulations on savings and loan directors similar to those imposed on holding companies under the Holding Company Act, 12 U.S.C. § 1730a.

Citing *Capozzi*, the Eastern District of Arkansas held that no private right of action exists in favor of the FSLIC as conservator of a failed savings and loan association against a holding company for dam-

ages from the holding company's failure to maintain the net worth of the association at the minimum regulatory level. *FSLIC v. Savers, Inc.*, No. LR–C–89–529 (E.D.Ark. June 12, 1990). The *Savers* Court rejected the FSLIC's contention the net worth agreement in that case was a contract, finding the holding company was already obligated under the regulations to maintain the association's net worth at the regulatory level, and therefore the holding company's promise was not consideration that would support a contract.

The Eastern District of Virginia also found that neither the Bank Holding Company Act nor the Change in Control Act, 12 U.S.C. section 1730(q)(1), create a private right of action for damages caused by failure to comply with regulatory requirements. *Ameribanc Investors Group v. Zwart*, 706 F.Supp. 1248 (E.D.Va.1989). Although *Zwart* arose from a struggle to forestall the takeover of a federally insured savings bank, the Court undertook an analysis similar to that of the Eighth Circuit in finding an implied private right of action to be inconsistent with Congressional intent. The *Zwart* Court seemed equally concerned about the policies of encouraging private investment in the savings and loan industry, and affording regulatory agencies the latitude to respond promptly to possible regulatory violations, unhampered by the delay typically associated with judicial proceedings.

■ This Court agrees with the results in these cases. The RTC can point to no authority supporting a private right of action to enforce a regulatory net worth maintenance condition or any other condition under the Holding Company Act or the Change of Control Act. Congress did not expressly create such a right of action, and courts to date have not implied one. This Court finds persuasive the argument there is not an implied private right of action. The Court holds that no private right of action exists in this case. Since this Court found Tetco's net worth stipulation basically concerned a regulation and not a contract, it follows the RTC cannot assert a private right of action to enforce that stipu-

lation. However, the Court also wishes to make clear its conclusion that even if the stipulation were a contract, there still would exist no private right of action to enforce that contract.

If this Court were to conclude the Simms letter set out the terms of a contract between Tetco and the FHLBB/FSLIC, and Bexar was a third-party beneficiary, it seems the remedies here sought under such a contract would be the same as, or substantially similar to, the remedies available to the RTC under the statutory scheme. The Court reaches such conclusion based on the RTC's representations made in oral argument of their Motion and in correspondence to Tetco, and the Court finds no authority to contradict same. The enforcement mechanism Congress afforded to the Office of Thrift Supervision in 12 U.S.C. section 1818 could well be the basis for giving FHLBB administrative recourse analogous to that available in a private action for damages based on contract, at least under the peculiar facts of this case.

The RTC's reliance on the distinction between its rights under the statute and its rights under the common law, which distinction would permit the RTC to avoid authorities that have found no private right of action under the Holding Company Act or the Change in Control Act, is misplaced. If Congress did not intend to give the appropriate agencies the right to enforce administrative regulatory provisions in a private suit denominated as an action under the statutes and regulations in question, surely it could not have intended for those agencies, or other interested private parties, to effect substantially the same remedies in a private lawsuit denominated as a contract claim. In other words, the remedies available in contract would be so nearly comparable to the administrative remedies as to compel the conclusion that the reasons for denying a private claim on the statute should apply with equal force to that claim in contract. The very same concerns over delay, anticompetitive pressure, and common law precedents contradicting legislative and regulatory schemes would be resurrected in a new guise were this

suit to enforce the regulation permitted to go forward in contract.

In consideration of the foregoing, it is the opinion of the Court that the Motion of the Defendant, Tetco, Inc., for Summary Judgment in this cause should be granted, and the Motion of the Plaintiff, the Resolution Trust Corporation, for Summary Judgment should be denied.

SO ORDERED.